### MARCUS BROWN HOLDING CO. v. FELDMAN et al.

(District Court, S. D. New York. December 15, 1920.)

1. **Courts** ⊙⟞347—**Multifarious bill against tenant and officer to test Housing Laws considered under equity rule 26.**

    A bill by a landlord against his tenants to require them to vacate the property, and against the district attorney to restrain the enforcement of the New York Housing Laws, though multifarious, presents matters which can properly be considered together, as authorized by Supreme Court rule in equity 26 (201 Fed. v, 118 C. C. A. v), since the determination of the validity of the statutes will settle all questions.

2. **Landlord and tenant** ⊙⟞280—**Bill in equity does not lie to dispossess tenants.**

    A landlord cannot proceed by bill in equity to dispossess tenants holding over after the expiration of the lease, since an action of ejectment affords a complete remedy.

3. **Trial** ⊙⟞11(3)—**Bill for legal relief transferred to law side.**

    A bill in equity, which seeks relief obtainable by action at law, need not be dismissed, but can be transferred to the law side, and a repleader granted under Act March 3, 1915 (Comp. St. § 1251a–1251c).

4. **Injunction** ⊙⟞105(2)—**Will issue to restrain prosecution under unconstitutional statute to protect rights of others.**

    Though, ordinarily, equity will not enjoin prosecution for violation of statutes alleged to be unconstitutional, but will permit that defense to be interposed in a prosecution, it can issue such injunction to restrain prosecution under the New York Housing Laws of 1920 (Laws 1920, c. 951), if they are invalid, since thereunder the landlord's agents and employés can be prosecuted for failure to furnish service to tenants, which would affect the landlord's property rights without his having an opportunity to be heard.

5. **Trial** ⊙⟞11(3)—**Legal cause, involving same question as equitable cause, will not be transferred to law side.**

    Where a bill in equity states a legal cause of action against tenants and an equitable cause of action to enjoin the enforcement of the statutes on which the tenants rely, both of which causes will be determined by ascertaining the validity of the laws, the legal cause of action need not be transferred to the law side, but can be determined in connection with the equitable cause.

6. **Constitutional law** ⊙⟞211—**"Equal protection of laws" does not prevent classification.**

    The "equal protection of the laws" guaranteed by Const. U. S. Amend. 14, means the protection of equal laws, and requires every state to give

---

⊙⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

equal protection and security to all under like circumstances, to the end that no greater burden shall be laid on one than on others in the same calling and condition; but such requirement does not prevent a classification of persons for purposes of regulation, if the classification has reasonable basis under the circumstances.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Equal Protection of the Law.]

**7. Constitutional law ☞48—Statute presumed constitutional.**

Any legislative act is presumptively constitutional, even though it is novel legislation.

**8. Constitutional law ☞70(3)—Wisdom of legislation not question for courts.**

The wisdom, expediency, or sincerity of legislative action is not open to judicial inquiry.

**9. Constitutional law ☞48—Court cannot presume that reasonable rent under Housing Laws is not market rent.**

In a suit attacking the validity of the New York Housing Laws of September 1920 (Laws 1920, cc. 943–945, 948–952), which prevent dispossessing of a tenant at the expiration of his term, if he is able and willing to pay a reasonable rent to be determined by proceedings under the statute, in which suit no accusation was made that those charged with adjusting the rent were rendering the laws unconstitutional by their practical interpretation thereof, the court cannot assume that the reasonable rent, as fixed by those proceedings, would differ from the rent which the landlord could obtain by bargain in open market and therefore cannot hold that those laws take the landlord's property for private use.

**10. Constitutional law ☞12—Constitution not strictly interpreted.**

A Constitution, unlike a Code or a statute, declares only fundamental principles, and is not to be interpreted with the strictness of a private contract.

**11. Constitutional law ☞117—Contract clause does not override state police power.**

A clause of the United States Constitution, prohibiting a state from impairing the obligation of contracts, does not override the police power of the state to establish regulations reasonably necessary to secure the health, comfort, or general welfare of the community.

**12. Eminent domain ☞2(1)—Police regulations may interfere with enjoyment of property without providing compensation.**

The Legislature of a state may make police regulations, although they interfere with the full enjoyment of private property, and no compensation is given therefor.

**13. Constitutional law ☞39—State's public policy is found in Constitution and valid laws.**

No state can have a public policy, except what is found in its Constitution and in its laws constitutionally enacted.

**14. Landlord and tenant ☞3, 200(1½)—Business of renting dwellings is subject to regulation, including the fixing of rents.**

The business of renting dwelling houses is a matter so affected with public interest that it may be regulated under the police power of the state, and such regulation may include the fixing of rents in times of abnormal stress, since the fixing of the price of necessaries is a long-established exercise of the police power.

**15. Constitutional law ☞240(1)—Classification of dwelling house landlords for regulation held reasonable.**

The classification of the New York Housing laws, which apply only to landlords renting dwelling houses, is not so unreasonable as to invalidate those laws, in view of the fact that the shortage of dwelling houses was especially acute, and of the necessity of obtaining dwellings without delay.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**16. Constitutional law ☞211—Power of classification restricted, only if no reason could sustain it.**

The classification adopted by the Legislature can be held invalid only if there is no reason which can be conceived which would sustain the classification.

In Equity. Suit by the Marcus Brown Holding Company against Marcus Feldman and others. On hearing on application to show cause why an injunction pendente lite should not be granted. Application denied, and bill dismissed.

Hearing under order to show cause, dated November 18, 1920, requiring the defendant Swann, as district attorney, to show cause why he should not be restrained pendente lite from instituting proceedings or actions of any kind against the plaintiff, its agents, etc., for failure or refusal to furnish heat, water, elevator service, etc., to the other defendants; also requiring the other defendants to show why they should not be restrained from "entering upon or continuing to occupy" the dwelling apartment described in the bill of complaint herein, or to make use of any property belonging to plaintiff without plaintiff's consent.

Plaintiff is a corporation of New Jersey; defendants citizens of New York and residents of this district. About September 30, 1920, plaintiff became owner in fee of a large apartment house in this city, worth (as alleged) upwards of $1,000,000. When plaintiff acquired this building, defendants other than the district attorney, were tenants therein holding an apartment under a written lease made by plaintiff's predecessor in title on October 1, 1917, and terminating September 30, 1920, which lease contains the usual mutual covenants for quiet enjoyment and peaceable surrender. This plaintiff landlord and its predecessors in title are in legal effect one legal entity.

In March, 1920, the landlord notified the tenant defendants to surrender possession of the apartment in question at the expiration of their lease; in point of fact the landlord, before giving notice, executed a new lease, taking effect at the expiration of defendants' tenancy, to other parties presumably more satisfactory to the lessor. In June, 1920, the tenant defendants advised the landlord that they were "willing to renew the lease of apartment in your premises at a reasonable increase, to be determined by the mayor's committee."

This was rejected, the landlord writing that it expected the tenants to "surrender the premises on the expiration of lease as therein provided." At expiry the tenant defendants refused to move, and, having answered herein, we assume the truth of their pleading alleging that they now are in occupancy of the apartment aforesaid under the protection of certain statutes of the state of New York, and "are and at all times have been ready, able, and willing to pay the fair and reasonable increase as the same may be determined by a court of competent jurisdiction."

Plaintiff, insisting upon its right to choose its own tenants, brings this suit, alleging the unconstitutionality of the statutes under which defendants justify retention of said apartment, which statutes are (as appears by the tenant defendants' answer) chapters 942 and 947 of the Laws of New York for 1920. Plaintiff alleges, as further violating its rights in the premises, other statutes of New York, being chapters 943–945, inclusive, and chapters 948–952, inclusive, and chapters 131, 132, and 135–138, inclusive, of the Laws of 1920.

Defendant Swann, as district attorney, is sued because by chapter 131, as amended by chapter 951, there is added to the Penal Law of the state the declaration that any lessor, agent, janitor (or the like) of any building wherein lessees are, expressly or impliedly, entitled to hot or cold water, heat, light, power, elevator service, telephone, or any other service or facility, who willfully or intentionally fails to furnish the same, or who so "interferes with the quiet enjoyment of the leased premises by such occupant," is guilty of a misdemeanor.

The prayer as to the tenant defendants is that they be "enjoined and restrained from entering upon or continuing to occupy the apartment herein

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

described or to make use of any of the property belonging to this complainant without the complainant's consent." As to the district attorney, the prayer is that he be enjoined from instituting any proceeding or action under the statute above alluded to or otherwise, for any failure or refusal on the part of the plaintiff to furnish the facilities above referred to to the tenant defendants or "any other person occupying any part of the building" (belonging to plaintiff) without "its consent or permission, and holding over against its will after October 1, 1920, under color of the statutes and laws" above referred to.

Hearing is on the bill, the answer of the tenant defendants, the affidavit, verified November 17, 1920, of Mr. Joseph A. Seidman, attorney for plaintiff, the affidavit, verified December 3, 1920, of Mr. Samuel R. Gerstein, attorney for tenant defendants, and certain public documents, viz. "Report of the Joint Legislative Committee on Housing," transmitted to the Legislature of New York on September 20, 1920, and the message (bearing the same date) of Governor Alfred E. Smith relative to "housing facilities within the state and recommending legislation in reference thereto."

It thus appears as a fact satisfactorily proven that the statutes above enumerated from chapters 942-952, inclusive (except chapter 946), commonly and collectively known as the September Housing Laws), were made laws, for the reason and in response to the demand or emergency insistently presented to the Legislature by the above-mentioned report of its own joint committee and by the Governor's message. The other statutes complained of by plaintiff are collectively known as the "April Housing Laws." Assuming legislative power to enact all these laws, the April statutes have been almost wholly superseded by those of September. The importance of the earlier statutes, so far as this bill is concerned, seems to be that, should the September acts be voided, argument might be made that the April acts were revived; hence complaint is made of all the housing legislation of 1920.

Joseph A. Seidman, of New York City, for plaintiff.

Francis M. Scott and I. Maurice Wormser, both of New York City, amici curiæ.

Samuel R. Gerstein, of New York City, for tenant defendants.

William D. Guthrie and Julius Henry Cohen, Sp. Deputy Attys. Gen., both of New York City (Elmer G. Sammis and Bernard Hershkopf, both of New York City, of counsel), for Joint Legislative Committee on Housing.

Robert S. Johnstone, of New York City (John Caldwell Myers, of New York City, of counsel), for defendant Swann.

David L. Podell, Benjamin S. Kirsh, and Jacob Podell, all of New York City, for tenant.

Before HOUGH, Circuit Judge, and MAYER and AUGUSTUS N. HAND, District Judges, sitting pursuant to Judicial Code, § 266 (Comp. St. § 1243).

HOUGH, Circuit Judge (after stating the facts as above). Several objections to plaintiff's right to be heard have been insisted on and must be first considered.

[1] The bill (it is said) sets forth several matters of a distinct and independent nature against several defendants and is therefore multifarious. In our opinion this is true, but it is also true that the twenty-sixth Supreme Court rule in equity (201 Fed. v, 118 C. C. A. v) has rendered that defense unavailable, whenever, in the opinion of the court, "sufficient grounds appear for uniting the causes of action in order to permit the convenient administration of justice." The rule has been thus interpreted in this district since its promulgation.

And see Crawford v. Washington, etc., Co., 233 Fed. 966, 147 C. C. A. 635; Eclipse Co. v. Harley (D. C.) 244 Fed. 463, United States v. New England, etc., Exchange (D. C.) 258 Fed. 732.

The separate matters in this bill are two—one a complete severable cause of action against the district attorney; the other (equally complete) against the tenant defendants—yet plainly the constitutionality or the reverse of any action by the district attorney depends wholly upon the constitutionality of these housing statutes. The rights of occupiers against landlords will, as to the services referred to in chapter 951, depend upon the constitutionality of the statutes permitting them to remain where they are not wanted. Consequently the connection between the rights of the tenant defendants and those of the district attorney is so intimate that both rights grow out of the same mass of legislation, and they should be tested together. This case affords a good example of the wisdom of abrogating the strict rule regarding multifarious pleading.

[2] It is further said that the bill as affecting the tenant defendants is no more than an endeavor to bring an ejectment suit in equity. Such efforts have often been made and always failed (Smyth v. New Orleans, etc., Co., 141 U. S. 656, 12 Sup. Ct. 113, 35 L. Ed. 891), and this bill suggests no circumstances under which this court of equity would be empowered to issue mandatory injunctions which would be the equivalents of writs of possession; yet this is the futile prayer of the bill.

[3] But under modern procedure the dismissal of the bill does not necessarily follow. On the contrary, the court is required by Act March 3, 1915, 38 Stat. 956 (Comp. St. § 1251a–1251c), to transfer any action wrongly brought in equity to the law side, and grant a repleader.

This plaintiff might, however, have brought an action for the recovery of possession of real property (ejectment) at law and in this court. No state statute can define or limit the jurisdiction of this court; and this is true, although it be assumed that the defenses in ejectment authorized by the statutes enumerated would be as available to defendants in the United States courts sitting in New York as they are in the tribunals of the state.

[4] It is next objected that the bill cannot stand as against the district attorney, because the question must be raised after indictment, and in the criminal court. Considering the actual sequence of events in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283, Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, and Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, courts of first instance may well refrain from much legal exposition.

It is true that the reasons assigned in some of these cases for going into equity were in substance that the party complaining would be injured in some constitutional right by the operation of a statute al-

leged to be unconstitutional without ever being proceeded against himself, while in this instance plaintiff is personally subject to the operation of chapter 951.

But the public documents above mentioned prove that the object of chapter 951 is not to extend criminal liability to owners of apartment houses, for that was done in April by chapter 131. The purpose is to make criminally liable substantially all of the landlord's servants or agents concerned in the operation of an apartment house; and the reason for this is that it had been found practically impossible to prove guilty knowledge on the landlord's part, wherefore conviction was impossible.

We do not understand that the Supreme Court has in proceedings like this barred from equity *all* persons who may be pursued under a criminal statute, but only those who have under the statute a fair opportunity of raising the constitutional question in criminal proceedings brought directly against them. But in the cases which the Legislature expected to produce by chapter 951 this defendant would have no standing; yet if its agents are convicted such conviction may obviously produce civil suits against and resultant liability on the part of this plaintiff.

Without attempting to define the limitations of bills in equity against officials charged with the administration of the criminal law, we think this suit is within the practice of the cases cited. We therefore have before us two causes of action severally cognizable in this court, though not in the same litigation. This is not because the bill is multifarious, but because one cause of action is legal and the other equitable. We may shortly note here that the jurisdictional amount is well pleaded, which is enough for present purposes.

[5] It is, however, plain that if the statutes affecting the rights of the plaintiff and the tenant defendants are constitutional plaintiff can no more succeed in an action of ejectment at law than it can under this bill in equity, and it is equally clear that if such statutes are constitutional the bill against the district attorney should be dismissed. It is therefore an idle ceremony to separate the causes of action and send one to the law side of the court, and we shall now consider whether in any form of procedure on either side of the court or against any defendant, plaintiff has revealed a cause of action.

Disregarding chapter 948, which affects Buffalo and Rochester only, and speaking generally of the other September laws, the legislative intent is this: Within what may be called the metropolitan district (New York City and contiguous counties) the owners of dwellings, including apartment and tenement houses (but excepting buildings under construction in September last, lodging houses for transients and the larger hotels), are wholly deprived until November 1, 1922, of all legal methods of removing from their premises the tenants or occupants of September, 1920, provided that such tenants or occupants are (in effect) ready, able, and willing to pay a reasonable rent or price for their use and occupation. Whenever (the commonest case in this city) the tenancy was from month to month, any demanded rent greater than that of a year prior to such demand is presumptively unrea-

sonable and oppressive. Whether the landlord attempts to recover the desired rent by personal action, or tries to get back his premises by dispossess proceedings or ejectment, a September occupant can always block him and remain in possession by bringing into court a sum equivalent to the last month's rent, until the issue of unreasonableness is passed on by court and jury. The landlord's former legal rights are intact, however, when the occupant is "objectionable," when the demanding landlord is a "corporation formed under a co-operative ownership plan," and when the building is in good faith required for the purpose of demolition and rebuilding or the personal occupancy of the owner.

A knowledge of pre-existing law and the words of the statutes are enough to prove that the legislative desire is to maintain for about two years the September status of the kind of dwellings in which (by common knowledge) lives the major portion of the population of the metropolitan district. This status is to be maintained against the landlord's will if necessary, but at the option of the tenants, for the landlord cannot select his tenants, but must accept what may be called the statutory tenants, yet every such tenant is and will be as free to depart and choose another landlord as he was before September, 1920.

Finally, to prevent owners from rendering their apartments uncomfortable for, if not uninhabitable by, the unwelcome statutory occupants, any intentional diminution or denial of the ordinary facilities or conveniences of apartment house life is made a misdemeanor on the part, not only of the owner, but substantially of every person connected with the management of the building, if intentional failure to furnish such facilities can be proven against him.

Speaking now specifically of the facts in the present case, the tenant defendants herein, by law older than the state of New York, became at the landlord's option trespassers on October 1, 1920. Plaintiff had then found and made a contract with a tenant it liked better, and had done so before these statutes were enacted. By them plaintiff is, after defendants elected to remain in possession, forbidden to carry out his bargain with the tenant he chose, the obligation of the covenant for peaceable surrender by defendants is impaired, and for the next two years Feldman et al. may, if they like, remain in plaintiff's apartment, provided they make good month by month the allegation of their answer, i. e., pay what "a court of competent jurisdiction" regards as fair and reasonable compensation for such enforced use and occupancy; and meanwhile, if any person concerned in the management of the apartment house intentionally cuts off any of the facilities or conveniences appurtenant to apartment house life when Feldman and Schwartz were presumptively desired as tenants, a crime has been committed.

Since jurisdiction depends on diversity of citizenship, plaintiff is entitled to urge violations of the state as well as the federal Constitution, but this court will confine itself to the latter charter of rights, the construction of the state Constitution having been exhaustively considered by the courts of the state in contemporaneous and similar litigation. It is asserted that by these statutes the obligations of plaintiff's contracts have been impaired, and so have those of a great number of

other landlords. This is plainly true; the interpretation of section 10 of article 1 of the Constitution made in Green v. Biddle, 8 Wheat. 1, 5 L. Ed. 547, has never been departed from.

Further assertion is that plaintiff and other landlords similarly situated have been denied the equal protection of the laws in that the owners of finished and presumably occupied dwellings have been chosen for legislative oppression, when no such burdens have been laid on owners of dwellings as yet unfinished or hereafter to be erected, nor upon those possessed of office and business property, hotels and the like, who use their real estate for purposes of profit in the same manner and to the same extent as do the dwelling house landlords.

[6] It has been often said that the equal protection of the laws mentioned in the Fourteenth Amendment means a pledge of the protection of equal laws, and more specifically that every state shall give equal protection and security to all under like circumstances to the end that no greater burdens shall be laid upon one than are laid upon the others in the same calling and condition. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923. But it is also fundamental that such equality is not as matter of law inconsistent with classification both for benefits and burdens, and exactly how that classification may be made has never been defined, and we think never ought to be, having regard to the infinitely changing circumstances of human society. When by classification or otherwise we arrive at "a partial or private law which directly purposes to destroy or affect individual rights," it is "unconstitutional and void," for "were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community who made the law, by another." Cotting v. Kansas City, &c., Co., 183 U. S. at page 105, 22 Sup. Ct. 41, 46 L. Ed. 92. While a forbidden result may be thus denounced, well-founded uncertainty as to means has produced the ruling that "what may be regarded as a denial of the equal protection of the laws is a question not * * * easily determined, * * * no rule can be formulated that will cover every case," and the highest court has gone no further in the way of definition than to say that no class of persons shall be denied the same protection enjoyed by "other classes in the same place and in like circumstances." Connolly v. Union, etc., Co., 184 U. S. at page 558, 22 Sup. Ct. 431, 46 L. Ed. 679. The phrase "in like circumstances" leaves open a question newly presented in each new case.

Again, it is said that these statutes put an end to liberty of contract and take property for a private use, and therefore in both respects amount to a denial of due process of law. That as to one and a very large fraction of the contractual engagements current in this city there is no liberty of contract under these statutes cannot be denied, and that property is taken from the landlord for the use of the statutory tenant is also true, in the sense that the property owner may be and is in this instance compelled to let his property be enjoyed by one whom he does not want, and it may be true in another sense, although the statutory tenant be a person entirely satisfactory except in the amount of rent he pays, if there be any legal difference between what the landlord could

get in the open market for his property and that reasonable rent for the fixing and recovery of which the state still affords legal machinery.

But when appeal is made to the due process clause of the Fourteenth Amendment it must always be remembered that so far as the national Constitution is concerned the phrase has never been authoritatively and finally delimited or defined; definition has been declined, because it is better to ascertain meaning in each case by a process of judicial inclusion and exclusion. Davidson v. New Orleans, 96 U. S. 104, 24 L. Ed. 616.

[7] It is a wearisome truism that any legislative act is presumptively constitutional; it is also true that in popular, if not in professional, estimation the presumption weakens in proportion to the novelty or singularity of the statute. No legislation really like that at bar has been discovered in American history by the research of counsel, and the nearest (and not very near) instances known to us are the stay and collection laws of many states (notably Kentucky) in the early days of the last century, and the limitations upon the private use of real property, considered in Welch v. Swasey, 214 U. S. 91, 29 Sup. Ct. 567, 53 L. Ed. 923.

[8] But, no matter how astonishing the legislation appears to the citizen, it has been so many times said that the wisdom, expediency or sincerity of the Legislature is not open to judicial inquiry, that citation is superfluous. Judicial review is, and always has been, properly limited to an inquiry into the reason for the ascertained legislative intention—starting with the premise that the mere "say so" of the Legislature does not furnish a reason by its mere existence.

This inquiry has led courts very far, and it is doubtless true that reasons have of late years been judicially considered concerning which previous generations were not asked to inquire, and would have perhaps deemed the inquiry superfluous, if not improper. How wide this investigation has become, and how rapidly its scope has enlarged, can be seen by comparing not only the decisions, but especially the briefs and records in Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, with those in Muller v. Oregon, 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957.

The reason for the laws here involved is patent from the public documents above mentioned; no appeal need be made to common knowledge or contemporary observation. In October last the Municipal Courts of New York City were flooded with more "notices to quit"—i. e., summary dispossess proceedings—than had ever before been known during an entire year. They amounted to 100,000, and according to the estimate of families commonly used by local relief associations and other statisticians the number of persons involved in each dispossess proceeding was not less than 4, and in all probability 5. This meant that nearly 10 per cent. of the permanent population of the city would (if existing laws took their course) shortly be seeking other habitations on the eve of winter.

The demands of a world at war had for several years produced such application of men, money, and material to other and more immediately lucrative occupations that new dwellings in the city of New York and

adjacent territory were conspicuously absent, while the same attractions that had practically stopped building had increased the home-seeking population of the city to an extent unstated, but certainly large.

This almost total absence of new homes produced a demand for the old out of proportion to the supply. Such demand raised the market value of the old, and correspondingly diminished economic equality, or equality in bargaining, between any actual landlord and any would-be tenant, either new or old. Such conditions produced a reason deemed sufficient by the Legislature to prefer in the struggle for living space the tenants in possession to all others, and to them was given the option of remaining at a reasonable rent, so called—really a statutory charge for use and occupation—but there was secured to the landlord a legal machinery for ascertaining such reasonable compensation.

[9] As matter of law we cannot hold that the market value or price —i. e., what is fetched when goods are bought and sold in the ordinary course of trade (Muser v. Magone, 155 U. S. 240, 15 Sup. Ct. 77, 39 L. Ed. 135)—is for the use of real property anything different from that reasonable rent or use charge secured to the landlord by these statutes. We have nothing before us but the statutes; no accusation is made that those charged with adjusting rent are rendering the acts unconstitutional by their practical interpretation of their duties thereunder. We therefore drop from further consideration the second part of plaintiff's argument regarding the taking of his property for private use. This does not, however, affect the asserted constitutional right to "choose his own tenant." Thus, we think, is reached the only inquiry open to a court: Is the reason assignable for the Housing Laws constitutionally sufficient to overcome the constitutional objections presented?

[10-12] It cannot be too often said that a constitution is not a code nor a statute, that it declares only fundamental principles, and is not "to be interpreted with the strictness of a private contract." Legal Tender Cases, 110 U. S. 421, 4 Sup. Ct. 122, 28 L. Ed. 204. To this doctrine we owe the rulings that even the contract clause of the Constitution does not override the power of the state to establish regulations reasonably necessary to secure the health, comfort, or general welfare of the community—that is, to exercise the police power of the state (Atlantic, etc., Co. v. Goldsboro, 232 U. S. 548, 34 Sup. Ct. 364, 58 L. Ed. 721); that in like manner "reasonable restraints" may be placed upon freedom of contract (Rail & River Co. v. Ohio, etc., Comm'n, 236 U. S. 338, 35 Sup. Ct. 359, 59 L. Ed. 607); and that a Legislature may make police regulations, although they interfere with the full enjoyment of private property, and no compensation be given (Chicago, etc., Co. v. Drainage Comm'n, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175). Such decisions (and we cite but few of many) reduce the question to this: Are these statutes an exercise of police power reasonably suitable for combating or lessening the evil proved, and therefore constitutional, although at other times and under other circumstances they might plainly be obnoxious to fundamental principles of constitutional government?

[13] In briefs something is said to the effect that the statutes are

justified because consonant with the state's "public policy." The assertion gets nowhere, for it is firmly established that no state can have a public policy, except what is to be found in its Constitution and its laws constitutionally enacted. People v. Hawkins, 157 N. Y. at page 12, 51 N. E. 257, 42 L. R. A. 490, 68 Am. St. Rep. 736. This case stands or falls on police power. Definition of this phrase has never advanced over Chief Justice Taney's declaration that it is no more than the power inherent in a sovereign. License Cases, 5 How. at page 583, 12 L. Ed. 256. Applied to a state, this means its reserved sovereignty, inherent and incapable of being bartered away, because necessary for the state's existence, and lessened only by what the people of the state joined with all the other people of the other states in conveying to and consolidating in the United States.

On reason, then, if a given subject-matter is appropriate to the exercise of sovereign action, and such action has not been expressly and absolutely prohibited by the federal Constitution as authoritatively construed, the legislative result is not forbidden, where the purpose is within the range of reserved sovereignty, the means appropriate, and the reason sufficient, even though in reaching the result some toes be trodden on; and how many toes and how severely they may be trampled is a question that varies with circumstances. We may inquire, therefore, whether the subject-matter of these statutes is historically appropriate for legislative regulation. While rarely, if ever, exercised in America, there can be no doubt that one of the oldest exercises of sovereignty has been to fix the price and use of some of the necessities of life, especially bread. Shelter is as much a necessary as bread, and that likewise has in times of stress been the subject of regulation, and indeed of apportionment. Freund on Police Power, § 308.

There have been, however, since the dawn of our legal history, some occupations closely allied with the necessities of life, which have always been governmentally regulated, both as to prices chargeable and persons to be served. The usual examples are innkeepers, carriers, millers, ferrymen, and wharfingers. At common law the property of these men was held to be devoted to a public use, and their occupations were public business. State v. Edwards, 86 Me. 102, 29 Atl. 947, 25 L. R. A. 504, 41 Am. St. Rep. 528. From this ancient doctrine grew the famous series of "elevator cases." Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757.

In and by these decisions the doctrine of property devoted to a public use became the doctrine of property affected with a public use, even when (as in the North Dakota Case) the elevator owner really wished to, and actually did, confine his storage facilities to grain he had himself bought and desired himself to sell again. Cf. dissenting opinion of Brewer, J. The step from property affected with a public use to a "business affected by a public interest" (i. e., fire insurance) was taken in German Alliance, etc., Co. v. Kansas, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189), and it must be now accepted on that authority as an "underlying principle that business of certain

kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulations."

[14] Since this pronouncement, and its legitimate and logical sequel, the "trading stamp" case (Rast v. Van Deman, 240 U. S. 342, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455), it may be and has been asserted that any business is affected with a public interest as soon as the electorate become sufficiently interested in it to pass a regulatory statute. It is not necessary to go so far, but we must and do hold that the business of renting out living space is quite as suitable for statutory regulation, and as much affected with a public interest, as fire insurance and trading stamps. It is easy to multiply quotations as to the inviolability of private business. It is singular how uniformly they come from decisions holding some business open to intimate regulation, while saying that, if such business were only private, it could not be regulated; but never is "private business" defined. It is another of those phrases which is left to a process of "inclusion and exclusion," which really means a finding of facts. Thus, when People v. Budd passed through the Court of Appeals in this state (117 N. Y. 1, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460) Judge Andrews declared:

"That no general power resides in the Legislature to regulate private business, prescribe the conditions under which it shall be conducted, fix the price of commodities or services, or interfere with freedom of contract, we cannot doubt."

Similarly and very lately it was said in Producers, etc., Co. v. Railroad Commission, 251 U. S. 228, 40 Sup. Ct. 131, 64 L. Ed. 239:

"It is, of course, true that, if the pipe line was constructed solely to carry oil for particular producers under strictly private contracts, and never was devoted by its owner to public use—that is, to carrying for the public—the state could not by mere legislative fiat, * * * convert it into a public utility or make its owner a common carrier."

That applicant had done just what the present plaintiff wants to do —selected its own customers, but it was regulated into taking customers it did not want, and so was Mr. Budd's elevator.

If, therefore, the allotment of necessaries in times of stress is a governmental function known to historic law, and the business now affected is (in such circumstances) one capable of being affected with a public interest, nothing remains of plaintiff's contention, except the complaint of inequality in legal protection, i. e. of classification. This is the nub of the matter, for it is plain that a reason must be clear which justifies on fundamental—i. e., constitutional—principles, the selection of one class of landlords for regulation and one class of tenants for favor and protection.

[15] The reason is clear; in property other than dwellings there was not, or there was not shown to be, such scarcity as existed in respect of livable rooms and apartments; the consequences of a scramble for stores or offices are not of the same deteriorating social character as is one for homes; men and women who want a place to sleep are peculiarly at the mercy of landlords, and that inequality in bargaining recognized in Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L.

Ed. 780, as a proper reason for regulation was present; while new buildings would certainly cost very much more than had the old ones; wherefore, if price regulation or limitation as to them was attempted in advance of completion at unknown cost, it would probably prevent exactly what was necessary to relieve the shortage that occasioned the evil to be combated.

[16] If the power of classification by Legislatures was ever judicially limited, the effort has been abandoned, unless some limitation can be found in the statement that a distinction is arbitrary, where no "state of facts reasonably can be conceived that would sustain it." Rast v. Van Deman, supra. No such rule, if it be a rule, finds application here. It is unnecessary to further parade decisions; from the Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394, to that of the Producers' Company, supra, at the last term of court, all the Fourteenth Amendment decisions are alike in refusing dogmatic definition and avoiding production of results by an inexorable legal logic; much, indeed most, has been left to circumstances as they arose, so that reported cases are not so much precedents of law as instructive and illustrative historical incidents; the effort has been to apply a sort of "rule of reason" to eternally changing facts.

Having examined the reason for these laws to the best of our ability, we hold it shown that an emergency existed, and that the resultant evil threatened to spread; that the legislative remedy is of a kind long known to the law, though not hitherto used in America; that the business affected is one capable of "superinducing the right of public regulation"; that the reason assignable for such regulation as embodied in the statutes challenged at bar is the kind of reason justifying this kind of statutes, and, it being sufficient in kind, we are not, and as a court cannot be, concerned with its sufficiency in degree.

We speak only in the present tense, and hold the statutes complained of to be constitutional; but it does not necessarily follow that because they violated no fundamental law in September or December, 1920, they will never so violate. Should it be shown thereafter that the reason for the laws had in fact passed, questions may arise not now before us, and as to which we do not wish to seem to foreclose discussion.

It appearing that no ground exists for either suit in equity or action at law, it is ordered that the bill be dismissed, without prejudice and without costs.

MAYER and AUGUSTUS N. HAND, District Judges, concur.