## HOME BUILDING & LOAN ASSOCIATION *v.* BLAISDELL ET AL.

No. 370.  Argued November 8, 9, 1933.—Decided January 8, 1934.

400

401

*Messrs. Alfred W. Bowen* and *Karl H. Covell* for appellant.

*Mr. Harry H. Peterson,* Attorney General of Minnesota, and *Mr. William S. Ervin,* Assistant Attorney General, with whom *Mr. George T. Simpson* was on the brief, for appellees.

412

414

Mr. Chief Justice Hughes delivered the opinion of the Court.

Appellant contests the validity of Chapter 339 of the Laws of Minnesota of 1933, p. 514, approved April 18, 1933, called the Minnesota Mortgage Moratorium Law,

as being repugnant to the contract clause (Art. I, § 10) and the due process and equal protection clauses of the Fourteenth Amendment, of the Federal Constitution. The statute was sustained by the Supreme Court of Minnesota, 189 Minn. 422, 448; 249 N.W. 334, 893, and the case comes here on appeal.

The Act provides that, during the emergency declared to exist, relief may be had through authorized judicial proceedings with respect to foreclosures of mortgages, and execution sales, of real estate; that sales may be postponed and periods of redemption may be extended. The Act does not apply to mortgages subsequently made nor to those made previously which shall be extended for a period ending more than a year after the passage of the Act (Part One, § 8). There are separate provisions in Part Two relating to homesteads, but these are to apply " only to cases not entitled to relief under some valid provision of Part One." The Act is to remain in effect " only during the continuance of the emergency and in no event beyond May 1, 1935." No extension of the period for redemption and no postponement of sale is to be allowed which would have the effect of extending the period of redemption beyond that date. Part Two, § 8.

The Act declares that the various provisions for relief are severable; that each is to stand on its own footing with respect to validity. Part One, § 9. We are here concerned with the provisions of Part One, § 4, authorizing the District Court of the county to extend the period of redemption from foreclosure sales " for such additional time as the court may deem just and equitable," subject to the above described limitation. The extension is to be made upon application to the court, on notice, for an order determining the reasonable value of the income on the property involved in the sale, or if it has no income, then the reasonable rental value of the property, and directing the mortgagor " to pay all or a reasonable part of such

income or rental value, in or toward the payment of taxes, insurance, interest, mortgage . . . indebtedness at such times and in such manner " as shall be determined by the court.[1] The section also provides that the time for re-

---

[1] That section is as follows:

" Sec. 4. *Period of Redemption May be Extended.*—Where any mortgage upon real property has been foreclosed and the period of redemption has not yet expired, or where a sale is hereafter had, in the case of real estate mortgage foreclosure proceedings, now pending, or which may hereafter be instituted prior to the expiration of two years from and after the passage of this Act, or upon the sale of any real property under any judgment or execution where the period of redemption has not yet expired, or where such sale is made hereafter within two years from and after the passage of this Act, the period of redemption may be extended for such additional time as the court may deem just and equitable but in no event beyond May 1st, 1935; provided that the mortgagor, or the owner in possession of said property, in the case of mortgage foreclosure proceedings, or the judgment debtor, in case of sale under judgment, or execution, shall prior to the expiration of the period of redemption, apply to the district court having jurisdiction of the matter, on not less than 10 days' written notice to the mortgagee or judgment creditor, or the attorney of either, as the case may be, for an order determining the reasonable value of the income on said property, or, if the property has no income, then the reasonable rental value of the property involved in such sale, and directing and requiring such mortgagor or judgment debtor, to pay all or a reasonable part of such income or rental value, in or toward the payment of taxes, insurance, interest, mortgage or judgment indebtedness at such times and in such manner as shall be fixed and determined and ordered by the court; and the court shall thereupon hear said application and after such hearing shall make and file its order directing the payment by such mortgagor, or judgment debtor, of such an amount at such times and in such manner as to the court shall, under all the circumstances, appear just and equitable. Provided that upon the service of the notice or demand aforesaid that the running of the period of redemption shall be tolled until the court shall make its order upon such application. Provided, further, however, that if such mortgagor or judgment debtor, or personal representative, shall default in the payments, or any of them, in such order required, on his part to be done, or commits waste, his right to redeem from said sale shall terminate 30 days

demption from foreclosure sales theretofore made, which otherwise would expire less than thirty days after the approval of the Act shall be extended to a date thirty days after its approval, and application may be made to the court within that time for a further extension as provided in the section. By another provision of the Act, no action, prior to May 1, 1935, may be maintained for a deficiency judgment until the period of redemption as allowed by existing law or as extended under the provisions of the Act has expired. Prior to the expiration of the extended period of redemption the court may revise or alter the terms of the extension as changed circumstances may require. Part One, § 5.

Invoking the relevant provision of the statute, appellees applied to the District Court of Hennepin County for an order extending the period of redemption from a foreclosure sale. Their petition stated that they owned a lot

after such default and holders of subsequent liens may redeem in the order and manner now provided by law beginning 30 days after the filing of notice of such default with the clerk of such District Court, and his right to possession shall cease and the party acquiring title to any such real estate shall then be entitled to the immediate possession of said premises. If default is claimed by allowance of waste, such 30 day period shall not begin to run until the filing of an order of the court finding such waste. Provided, further, that the time of redemption from any real estate mortgage foreclosure or judgment or execution sale heretofore made, which otherwise would expire less than 30 days after the passage and approval of this Act, shall be and the same hereby is extended to a date 30 days after the passage and approval of this Act, and in such case, the mortgagor, or judgment debtor, or the assigns or personal representative of either, as the case may be, or the owner in the possession of the property, may, prior to said date, apply to said court for and the court may thereupon grant the relief as hereinbefore and in this section provided. Provided, further, that prior to May 1, 1935, no action shall be maintained in this state for a deficiency judgment until the period of redemption as allowed by existing law or as extended under the provisions of this Act, has expired."

in Minneapolis which they had mortgaged to appellant; that the mortgage contained a valid power of sale by advertisement and that by reason of their default the mortgage had been foreclosed and sold to appellant on May 2, 1932, for $3700.98; that appellant was the holder of the sheriff's certificate of sale; that because of the economic depression appellees had been unable to obtain a new loan or to redeem, and that unless the period of redemption were extended the property would be irretrievably lost; and that the reasonable value of the property greatly exceeded the amount due on the mortgage including all liens, costs and expenses.

On the hearing, appellant objected to the introduction of evidence upon the ground that the statute was invalid under the federal and state constitutions, and moved that the petition be dismissed. The motion was granted and a motion for a new trial was denied. On appeal, the Supreme Court of the State reversed the decision of the District Court. 189 Minn. 422; 249 N.W. 334. Evidence was then taken in the trial court and appellant renewed its constitutional objections without avail. The court made findings of fact setting forth the mortgage made by the appellees on August 1, 1928, the power of sale contained in the mortgage, the default and foreclosure by advertisement, and the sale to appellant on May 2, 1932, for $3700.98 The court found that the time to redeem would expire on May 2, 1933, under the laws of the State as they were in effect when the mortgage was made and when it was foreclosed; that the reasonable value of the income on the property, and the reasonable rental value, was $40 a month; that the bid made by appellant on the foreclosure sale, and the purchase price, were the full amount of the mortgage indebtedness, and that there was no deficiency after the sale; that the reasonable present market value of the premises was $6000; and that the

total amount of the purchase price, with taxes and insurance premiums subsequently paid by appellant, but exclusive of interest from the date of sale, was $4056.39. The court also found that the property was situated in the closely built-up portions of Minneapolis; that it had been improved by a two-car garage, together with a building two stories in height which was divided into fourteen rooms; that the appellees, husband and wife, occupied the premises as their homestead, occupying three rooms and offering the remaining rooms for rental to others.

The court entered its judgment extending the period of redemption to May 1, 1935, subject to the condition that the appellees should pay to the appellant $40 a month through the extended period from May 2, 1933, that is, that in each of the months of August, September, and October, 1933, the payments should be $80, in two instalments, and thereafter $40 a month, all these amounts to go to the payment of taxes, insurance, interest, and mortgage indebtedness.[2] It is this judgment, sustained by the Supreme Court of the State on the authority of its former opinion, which is here under review. 189 Minn. 448; 249 N.W. 893.

The state court upheld the statute as an emergency measure. Although conceding that the obligations of the mortgage contract were impaired, the court decided that what it thus described as an impairment was, notwithstanding the contract clause of the Federal Constitution, within the police power of the State as that power was called into exercise by the public economic emergency which the legislature had found to exist. Attention is thus directed to the preamble and first section of the

---

[2] A joint statement of the counsel for both parties, filed with the court on the argument in this Court, shows that, after providing for taxes, insurance, and interest, and crediting the payments to be made by the mortgagor under the judgment, the amount necessary to redeem May 1, 1935, would be $4,258.82.

statute, which described the existing emergency in terms that were deemed to justify the temporary relief which the statute affords.[3]  The state court, declaring that it

[3] The preamble and the first section of the Act are as follows:

" Whereas, the severe financial and economic depression existing for several years past has resulted in extremely low prices for the products of the farms and the factories, a great amount of unemployment, an almost complete lack of credit for farmers, business men and property owners and a general and extreme stagnation of business, agriculture and industry, and

" Whereas, many owners of real property, by reason of said conditions, are unable, and it is believed, will for some time be unable to meet all payments as they come due of taxes, interest and principal of mortgages on their properties and are, therefore, threatened with loss of such properties through mortgage foreclosure and judicial sales thereof, and

" Whereas, many such properties have been and are being bid in at mortgage foreclosure and execution sales for prices much below what is believed to be their real values and often for much less than the mortgage or judgment indebtedness, thus entailing deficiency judgments against the mortgage and judgment debtors, and

" Whereas, it is believed, and the Legislature of Minnesota hereby declares its belief, that the conditions existing as hereinbefore set forth has created an emergency of such nature that justifies and validates legislation for the extension of the time of redemption from mortgage foreclosure and execution sales and other relief of a like character; and

" Whereas, The State of Minnesota possesses the right under its police power to declare a state of emergency to exist, and

" Whereas, the inherent and fundamental purpose of our government is to safeguard the public and promote the general welfare of the people; and

" Whereas, Under existing conditions the foreclosure of many real estate mortgages by advertisement would prevent fair, open and competitive bidding at the time of sale in the manner now contemplated by law, and

" Whereas, It is believed, and the Legislature of Minnesota hereby declares its belief, that the conditions existing as hereinbefore set forth have created an emergency of such a nature that justifies and validates changes in legislation providing for the temporary manner, method, terms and conditions upon which mortgage foreclosure sales

could not say that this legislative finding was without basis, supplemented that finding by its own statement of conditions of which it took judicial notice. The court said:

" In addition to the weight to be given the determination of the legislature that an economic emergency exists which demands relief, the court must take notice of other considerations. The members of the legislature come from every community of the state and from all the walks of life. They are familiar with conditions generally in every calling, occupation, profession, and business in the state. Not only they, but the courts must be guided by what is common knowledge. It is common knowledge that in the last few years land values have shrunk enormously. Loans made a few years ago upon the basis of the then going values cannot possibly be replaced on the basis of present values. We all know that when this law was enacted the large financial companies, which had made it their business to invest in mortgages, had ceased to do so. No bank would directly or indirectly loan on real estate mortgages. Life insurance companies, large investors in such mortgages, had even declared a moratorium as to the loan provisions of their policy contracts. The President had closed banks temporarily. The Con-

---

may be had or postponed and jurisdiction to administer equitable relief in connection therewith may be conferred upon the District Court, and

" Whereas, Mason's Minnesota Statutes of 1927, Section 9608, which provides for the postponement of mortgage foreclosure sales, has remained for more than thirty years, a provision of the statutes in contemplation of which provisions for foreclosure by advertisement have been agreed upon; "

" Section 1. *Emergency Declared to Exist.*—In view of the situation hereinbefore set forth, the Legislature of the State of Minnesota hereby declares that a public economic emergency does exist in the State of Minnesota."

gress, in addition to many extraordinary measures look-
ing to the relief of the economic emergency, had passed an
act to supply funds whereby mortgagors may be able
within a reasonable time to refinance their mortgages or
redeem from sales where the redemption has not
expired. With this knowledge the court cannot well hold
that the legislature had no basis in fact for the conclu-
sion that an economic emergency existed which called for
the exercise of the police power to grant relief." [189
Minn. 429; 249 N.W. 336.]

Justice Olsen of the state court, in a concurring opinion,
added the following:

" The present nation wide and world wide business and
financial crisis has the same results as if it were caused by
flood, earthquake, or disturbance in nature. It has de-
prived millions of persons in this nation of their employ-
ment and means of earning a living for themselves and
their families; it has destroyed the value of and the in-
come from all property on which thousands of people de-
pended for a living; it actually has resulted in the loss of
their homes by a number of our people and threatens to
result in the loss of their homes by many other people,
in this state; it has resulted in such widespread want and
suffering among our people that private, state, and mu-
nicipal agencies are unable to adequately relieve the want
and suffering, and congress has found it necessary to step
in and attempt to remedy the situation by federal aid.
Millions of the people's money were and are yet tied up in
closed banks and in business enterprises." [4]  [189 Minn.
437; 249 N.W. 340.]

---

[4] The Attorney General of the State in his argument before this
court made the following statement of general conditions in Minne-
sota: " Minnesota is predominantly an agricultural state. A little
more than one half of its people live on farms. At the time this law
was passed the prices of farm products had fallen to a point where
most of the persons engaged in farming could not realize enough from

We approach the questions thus presented upon the assumption made below, as required by the law of the State, that the mortgage contained a valid power of sale to be exercised in case of default; that this power was validly exercised; that under the law then applicable the period of redemption from the sale was one year and that it has been extended by the judgment of the court over the opposition of the mortgagee-purchaser; and that during the period thus extended, and unless the order for extension is modified, the mortgagee-purchaser will be unable to obtain possession, or to obtain or convey title in fee, as he would have been able to do had the statute

their products to support their families, and pay taxes and interest on the mortgages on their homes. In the fall and winter of 1932 in the villages and small cities where most of the farmers must market their produce, corn was quoted as low as eight cents per bushel, oats two cents and wheat twenty-nine cents per bushel, eggs at seven cents per dozen and butter at ten cents per pound. The industry second in importance is mining. In normal times Minnesota produces about sixty per cent of the iron of the United States and nearly thirty per cent of all the iron produced in the world. In 1932 the production of iron fell to less than fifteen per cent of normal production. The families of idle miners soon became destitute and had to be supported by public funds. Other industries of the state, such as lumbering and the manufacture of wood products, the manufacture of farm machinery and various goods of steel and iron have also been affected disastrously by the depression. Because of the increased burden on the state and its political subdivisions which resulted from the depression, taxes on lands, which provide by far the major portion of the taxes in this state, were increased to such an extent that in many instances they became confiscatory. Tax delinquencies were alarmingly great, rising as high as 78% in one county of the state. In seven counties of the state the tax delinquency was over 50%. Because of these delinquencies many towns, school districts, villages and cities were practically bankrupt. In many of these political subdivisions of the state local government would have ceased to function and would have collapsed had it not been for loans from the state." The Attorney General also stated that serious breaches of the peace had occurred.

not been enacted. The statute does not impair the integrity of the mortgage indebtedness. The obligation for interest remains. The statute does not affect the validity of the sale or the right of a mortgagee-purchaser to title in fee, or his right to obtain a deficiency judgment, if the mortgagor fails to redeem within the prescribed period. Aside from the extension of time, the other conditions of redemption are unaltered. While the mortgagor remains in possession he must pay the rental value as that value has been determined, upon notice and hearing, by the court. The rental value so paid is devoted to the carrying of the property by the application of the required payments to taxes, insurance, and interest on the mortgage indebtedness, While the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period.

In determining whether the provision for this temporary and conditional relief exceeds the power of the State by reason of the clause in the Federal Constitution prohibiting impairment of the obligations of contracts, we must consider the relation of emergency to constitutional power, the historical setting of the contract clause, the development of the jurisprudence of this Court in the construction of that clause, and the principles of construction which we may consider to be established.

Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the light of emergency and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions

which have always been, and always will be, the subject of close examination under our constitutional system.

While emergency does not create power, emergency may furnish the occasion for the exercise of power. "Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed." *Wilson* v. *New*, 243 U.S. 332, 348. The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the Federal Government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties.[5] When the provisions of the Constitution, in grant or restriction, are specific, so particularized as not to admit of construction, no question is presented. Thus, emergency would not permit a State to have more than two Senators in the Congress, or permit the election of President by a general popular vote without regard to the number of electors to which the States are respectively entitled, or permit the States to "coin money" or to "make anything but gold and silver coin a tender in payment of debts." But where constitutional grants and limitations of power are set forth in general clauses, which afford a broad outline, the process of construction is essential to fill in the details. That is true of the contract clause. The necessity of construction is not obviated by

---

[5] See *Ex parte Milligan*, 4 Wall. 2, 120–127; *United States* v. *Russell*, 13 Wall. 623, 627; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 155; *United States* v. *Cohen Grocery Co.*, 255 U.S. 81, 88.

the fact that the contract clause is associated in the same section with other and more specific prohibitions. Even the grouping of subjects in the same clause may not require the same application to each of the subjects, regardless of differences in their nature. See *Groves* v. *Slaughter*, 15 Pet. 449, 505; *Atlantic Cleaners & Dyers* v. *United States*, 286 U.S. 427, 434.

In the construction of the contract clause, the debates in the Constitutional Convention are of little aid.[6] But the reasons which led to the adoption of that clause, and of the other prohibitions of Section 10 of Article I, are not left in doubt and have frequently been described with eloquent emphasis.[7] The widespread distress following the revolutionary period, and the plight of debtors, had called forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations. Legislative interferences had been so numerous and extreme that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened. "The sober people of America" were convinced that some "thorough reform" was needed which would "inspire a general prudence and industry, and give a regular course to the business of society." *The Federalist,* No. 44. It was necessary to interpose the restraining power of a central authority in order to secure the foundations even of "private faith." The occasion and general purpose of

---

[6] Farrand, Records of the Federal Convention, vol. II, pp. 439, 440, 597, 610; Elliot's Debates, vol. V, pp. 485, 488, 545, 546; Bancroft, History of the U.S. Constitution, vol. 2; pp. 137–139; Warren, The Making of the Constitution, pp. 552–555. Compare Ordinance for the Government of the Northwest Territory, Art. 2.

[7] The Federalist, No. 44 (Madison); Marshall, Life of Washington, vol. 5, pp. 85–90, 112, 113; Bancroft, History of the U.S. Constitution, vol. 1, pp. 228 *et seq.*; Black, Constitutional Prohibitions, pp. 1–7; Fiske, The Critical Period of American History, 8th ed., pp. 168 *et seq.*; *Adams* v. *Storey,* 1 Paine's Rep., 79, 90–92.

the contract clause are summed up in the terse statement
of Chief Justice Marshall in *Ogden* v. *Saunders*, 12 Wheat.
pp. 213, 354, 355: "The power of changing the relative
situation of debtor and creditor, of interfering with con-
tracts, a power which comes home to every man, touches
the interest of all, and controls the conduct of every indi-
vidual in those things which he supposes to be proper for
his own exclusive management, had been used to such an
excess by the state legislatures, as to break in upon the
ordinary intercourse of society, and destroy all confidence
between man and man. This mischief had become so
great, so alarming, as not only to impair commercial in-
tercourse, and threaten the existence of credit, but to sap
the morals of the people, and destroy the sanctity of
private faith. To guard against the continuance of the
evil was an object of deep interest with all the truly
wise, as well as the virtuous, of this great community, and
was one of the important benefits expected from a reform
of the government."

But full recognition of the occasion and general purpose
of the clause does not suffice to fix its precise scope. Nor
does an examination of the details of prior legislation in
the States yield criteria which can be considered control-
ling. To ascertain the scope of the constitutional prohi-
bition we examine the course of judicial decisions in its
application. These put it beyond question that the pro-
hibition is not an absolute one and is not to be read with
literal exactness like a mathematical formula. Justice
Johnson, in *Ogden* v. *Saunders*, *supra*, p. 286, adverted to
such a misdirected effort in these words: ".It appears to
me, that a great part of the difficulties of the cause, arise
from not giving sufficient weight to the general intent of
this clause in the constitution, and subjecting it to a se-
vere literal construction, which would be better adapted
to special pleadings." And after giving his view as to the
purport of the clause—" that the States shall pass no law,

attaching to the acts of individuals other effects or consequences than those attached to them by the laws existing at their date; and all contracts thus construed, shall be enforced according to their just and reasonable purport "—Justice Johnson added: " But to assign to con-tracts, universally, a literal purport, and to exact for them a rigid literal fulfillment, could not have been the intent of the constitution. It is repelled by a hundred examples. Societies exercise a positive control as well over the inception, construction and fulfillment of contracts, as over the form and measure of the remedy to enforce them."

The inescapable problems of construction have been: What is a contract? [8] What are the obligations of contracts? What constitutes impairment of these obligations? What residuum of power is there still in the States in relation to the operation of contracts, to protect the vital interests of the community? Questions of this character, " of no small nicety and intricacy, have vexed the legislative halls, as well as the judicial tribunals, with an uncounted variety and frequency of litigation and speculation." Story on the Constitution, § 1375.

The obligation of a contract is " the law which binds the parties to perform their agreement." Sturges v. Crowninshield, 4 Wheat. 122, 197; Story, op. cit., § 1378. This Court has said that " the laws which subsist at the time and place of the making of a contract, and where it

---

[8] Contracts, within the meaning of the clause, have been held to embrace those that are executed, that is, grants, as well as those that are executory. *Fletcher* v. *Peck*, 6 Cranch 87, 137; *Terrett* v. *Taylor*, 9 Cranch 43. They embrace the charters of private corporations. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. But not the marriage contract, so as to limit the general right to legislate on the subject of divorce. *Id.*, p. 629; *Maynard* v. *Hill*, 125 U.S. 190, 210. Nor are judgments, though rendered upon contracts, deemed to be within the provision. *Morley* v. *Lake Shore & M. S. Ry. Co.*, 146 U.S. 162, 169. Nor does a general law, giving the consent of a State to be sued, constitute a contract. *Beers* v. *Arkansas*, 20 How. 527.

is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement. . . . Nothing can be more material to the obligation than the means of enforcement. . . . The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion." *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 550, 552. See, also, *Walker* v. *Whitehead*, 16 Wall. 314, 317: But this broad language cannot be taken without qualification. Chief Justice Marshall pointed out the distinction between obligation and remedy. *Sturges* v. *Crowninshield, supra,* p. 200. Said he: " The distinction between the obligation of a contract, and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct." And in *Von Hoffman* v. *City of Quincy, supra,* pp. 553, 554, the general statement above quoted was limited by the further observation that " It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances." And Chief Justice Waite, quoting this language in *Antoni* v. *Greenhow,* 107 U.S. 769, 775, added: " In all such cases the question becomes, therefore, one of reasonableness, and of that the legislature is primarily the judge."

The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them [9] (*Sturges* v. *Crowninshield, supra*, pp. 197, 198) and impairment, as above noted, has been predicated of laws which without destroying contracts derogate from substantial contractual rights.[10] In *Sturges* v. *Crowninshield, supra*, a state insolvent law, which discharged the debtor from liability was held to be invalid as applied to contracts in existence when the law was passed. See *Ogden* v. *Saunders, supra*. In *Green* v. *Biddle*, 8 Wheat. 1, the legislative acts, which were successfully assailed, exempted the occupant of land from the payment of rents and profits to the rightful owner and were "parts of a system the object of which was to compel the rightful owner to relinquish his lands or pay for all lasting improvements made upon them, without his consent or default." In *Bronson* v. *Kinzie*, 1 How. 311, state legislation, which had been enacted for the relief of debtors in view of the seriously depressed condition of business,[11] following the panic of 1837, and which provided that the equitable estate of the mortgagor should not be extin-

[9] But there is held to be no impairment by a law which removes the taint of illegality and thus permits enforcement, as, *e.g.*, by the repeal of a statute making a contract void for usury. *Ewell* v. *Daggs*, 108 U.S. 143, 151.

[10] See, in addition to cases cited in the text, the following: *Farmers & Mechanics Bank* v. *Smith*, 6 Wheat. 131; *Piqua Bank* v. *Knoop*, 16 How. 369; *Dodge* v. *Woolsey*, 18 How. 331; *Jefferson Branch Bank* v. *Skelly*, 1 Black 436; *State Tax on Foreign-held Bonds*, 15 Wall. 300; *Farrington* v. *Tennessee*, 95 U.S. 679; *Murray* v. *Charleston*, 96 U.S. 432; *Hartman* v. *Greenhow*, 102 U.S. 672; *McGahey* v. *Virginia*, 135 U.S. 662; *Bedford* v. *Eastern Bldg. & Loan Assn.*, 181 U.S. 227; *Wright* v. *Central of Georgia Ry. Co.*, 236 U.S. 674; *Central of Georgia Ry. Co.* v. *Wright*, 248 U.S. 525; *Ohio Public Service Co.* v. *Fritz*, 274 U.S. 12.

[11] See Warren, The Supreme Court in United States History, vol. 2, pp. 376-379.

guished for twelve months after sale on foreclosure, and further prevented any sale unless two-thirds of the appraised value of the property should be bid therefor, was held to violate the constitutional provision. It will be observed that in the *Bronson* case, aside from the requirement as to the amount of the bid at the sale, the extension of the period of redemption was unconditional, and there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period. *McCracken* v. *Hayward*, 2 How. 608, *Gantly's Lessee* v. *Ewing*, 3 How. 707, and *Howard* v. *Bugbee*, 24 How. 461, followed the decision in *Bronson* v. *Kinzie;* that of *McCracken*, condemning a statute which provided that an execution sale should not be made of property unless it would bring two-thirds of its value according to the opinion of three householders; that of *Gantly's Lessee*, condemning a statute which required a sale for not less than one-half the appraised value; and that of *Howard*, making a similar ruling as to an unconditional extension of two years for redemption from foreclosure sale. In *Planters' Bank* v. *Sharp*, 6 How. 301, a state law was found to be invalid which prevented a bank from transferring notes and bills receivable which it had been duly authorized to acquire. In *Von Hoffman* v. *City of Quincy, supra,* a statute which restricted the power of taxation which had previously been given to provide for the payment of municipal bonds was set aside. *Louisiana* v. *Police Jury*, 111 U.S. 716, and *Seibert* v. *Lewis*, 122 U.S. 284 are similar cases.

In *Walker* v. *Whitehead*, 16 Wall. 314, the statute, which was held to be repugnant to the contract clause, was enacted in 1870 and provided that in all suits pending on any debt or contract made before June 1, 1865, the plaintiff should not have a verdict unless it appeared that all taxes chargeable by law on the same had been

duly paid for each year since the contract was made; and further, that in all cases of indebtedness of the described class the defendant might offset any losses he had suffered in consequence of the late war either from destruction or depreciation of property. See *Daniels* v. *Tearney*, 102 U.S. 415, 419. In *Gunn* v. *Barry*, 15 Wall. 610, and *Edwards* v. *Kearzey*, 96 U.S. 595, statutes applicable to prior contracts were condemned because of increases in the amount of the property of judgment debtors which were exempted from levy and sale on excution. But, in *Penniman's Case*, 103 U.S. 714, 720, the Court decided that a statute abolishing imprisonment for debt did not, within the meaning of the Constitution, impair the obligation of contracts previously made;[12] and the Court said: " The general doctrine of this court on this subject may be thus stated: In modes of proceeding and forms to enforce the contract the legislature has the control, and may enlarge, limit or alter them, provided it does not deny a remedy or so embarrass it with conditions or restrictions as seriously to impair the value of the right." In *Barnitz* v. *Beverly*, 163 U.S. 118, the Court held that a statute which authorized the redemption of property sold on foreclosure, where no right of redemption previously existed, or which extended the period of redemption beyond the time formerly allowed, could not constitutionally apply to a sale under a mortgage executed before its passage. This ruling was to the same effect as that in *Bronson* v. *Kinzie, supra,* and *Howard* v. *Bugbee, supra.* But in the *Barnitz* case, the statute contained a provision for the prevention of waste, and authorized the appointment of a receiver of the premises sold. Otherwise the extension of the period for redemption was unconditional, and in case a receiver was appointed,

---

[12] See *Sturges* v. *Crowninshield,* 4 Wheat. 122, 200, 201; *Mason* v. *Haile,* 12 Wheat. 370, 378; *Beers* v. *Haughton,* 9 Pet. 329, 359.

the income during the period allowed for redemption, except what was necessary for repairs and to prevent waste, was still to go to the mortgagor.

None of these cases, and we have cited those upon which appellant chiefly relies, is directly applicable to the question now before us in view of the conditions with which the Minnesota statute seeks to safeguard the interests of the mortgagee-purchaser during the extended period. And broad expressions contained in some of these opinions went beyond the requirements of the decision, and are not controlling. *Cohens* v. *Virginia*, 6 Wheat. 264, 399.

Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes,[13] but the State also continues to possess authority to safeguard the vital interests of its people. It does

---

[13] Illustrations of changes in remedies, which have been sustained, may be seen in the following cases: *Jackson* v. *Lamphire*, 3 Pet. 280; *Hawkins* v. *Barney's Lessee*, 5 Pet. 457; *Crawford* v. *Branch Bank*, 7 How. 279; *Curtis* v. *Whitney*, 13 Wall. 68; *Railroad Co.* v. *Hecht*, 95 U.S. 168; *Terry* v. *Anderson*, 95 U.S. 628; *Tennessee* v. *Sneed*, 96 U.S. 69; *South Carolina* v. *Gaillard*, 101 U.S. 433; *Louisiana* v. *New Orleans*, 102 U.S. 203; *Connecticut Mutual Life Ins. Co.* v. *Cushman*, 108 U.S. 51; *Vance* v. *Vance*, 108 U.S. 514; *Gilfillan* v. *Union Canal Co.*, 109 U.S. 401; *Hill* v. *Merchants' Ins. Co.*, 134 U.S. 515; *New Orleans City & Lake R. Co.* v. *New Orleans*, 157 U.S. 219; *Red River Valley Bank* v. *Craig*, 181 U.S. 548; *Wilson* v. *Standefer*, 184 U.S. 399; *Oshkosh Waterworks Co.* v. *Oshkosh*, 187 U.S. 437; *Waggoner* v. *Flack*, 188 U.S. 595; *Bernheimer* v. *Converse*, 206 U.S. 516; *Henley* v. *Myers*, 215 U.S. 373; *Selig* v. *Hamilton*, 234 U.S. 652; *Security Savings Bank* v. *California*, 263 U.S. 282.

Compare the following illustrative cases, where changes in remedies were deemed to be of such a character as to interfere with substantial rights: *Wilmington & Weldon R. Co.* v. *King*, 91 U.S. 3; *Memphis* v. *United States*, 97 U.S. 293; *Virginia Coupon Cases*, 114 U.S. 269, 270, 298, 299; *Effinger* v. *Kenney*, 115 U.S. 566; *Fisk* v. *Jefferson Police Jury*, 116 U.S. 131; *Bradley* v. *Lightcap*, 195 U.S. 1; *Bank of Minden* v. *Clement*, 256 U.S. 126.

not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." *Stephenson* v. *Binford,* 287 U.S. 251, 276. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.

While the charters of private corporations constitute contracts, a grant of exclusive privilege is not to be implied as against the State. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420. And all contracts are subject to the right of eminent domain. *West River Bridge* v. *Dix,* 6 How. 507.[14] The reservation of this necessary authority of the State is deemed to be a part of the contract. In the case last cited, the Court answered the forcible challenge of the State's power by the following statement of the controlling principle,—a statement reiterated by this Court speaking through Mr. Justice Brewer, nearly fifty years later, in *Long Island Water Supply Co.* v. *Brooklyn,* 166 U.S. 685, 692: " But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the lit-

---

[14] See, also, *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U.S. 650, 673; *Offield* v. *New York, N. H. & H. R. Co.,* 203 U.S. 372; *Cincinnati* v. *Louisville & N. R. Co.,* 223 U.S. 390; *Pennsylvania Hospital* v. *Philadelphia,* 245 U.S. 20, 23; *Galveston Wharf Co.* v. *Galveston,* 260 U.S. 473, 476; *Georgia* v. *Chattanooga,* 264 U.S. 472.

eral terms of the contract itself; they are superinduced by the preëxisting and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur."

The legislature cannot " bargain away the public health or the public morals." Thus, the constitutional provision against the impairment of contracts was held not to be violated by an amendment of the state constitution which put an end to a lottery theretofore authorized by the legislature. *Stone* v. *Mississippi,* 101 U.S. 814, 819. See, also, *Douglas* v. *Kentucky,* 168 U.S. 488, 497–499; compare *New Orleans* v. *Houston,* 119 U.S. 265, 275. The lottery was a valid enterprise when established under express state authority, but the legislature in the public interest could put a stop to it. A similar rule has been applied to the control by the State of the sale of intoxicating liquors. *Beer Co.* v. *Massachusetts,* 97 U.S. 25, 32, 33; see *Mugler* v. *Kansas,* 123 U.S. 623, 664, 665. The States retain adequate power to protect the public health against the maintenance of nuisances despite insistence upon existing contracts. *Fertilizing Co.* v. *Hyde Park,* 97 U.S. 659, 667; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U.S. 746, 750. Legislation to protect the public safety comes within the same category of reserved power. *Chicago, B. & Q. R. Co.* v. *Nebraska,* 170 U.S. 57, 70, 74; *Texas & N. O. R. Co.* v. *Miller,* 221 U.S. 408, 414; *Atlantic Coast Line R. Co.* v. *Goldsboro,* 232 U.S. 548, 558. This principle has had recent and noteworthy application to the regulation of the use of public highways by common carriers and " contract carriers," where the assertion of

interference with existing contract rights has been without avail. *Sproles* v. *Binford*, 286 U.S. 374, 390, 391; *Stephenson* v. *Binford, supra.*

The economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. In *Manigault* v. *Springs*, 199 U.S. 473, riparian owners in South Carolina had made a contract for a clear passage through a creek by the removal of existing obstructions. Later, the legislature of the State, by virtue of its broad authority to make public improvements, and in order to increase the taxable value of the lowlands which would be drained, authorized the construction of a dam across the creek. The Court sustained the statute upon the ground that the private interests were subservient to the public right. The Court said (*id.,* p. 480): "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals." A statute of New Jersey prohibiting the transportation of water of the State into any other State was sustained against the objection that the statute impaired the obligation of contracts which had been made for furnishing such water to persons without the State. *Hudson Water Co.* v. *McCarter*, 209 U.S. 349. Said the Court, by Mr. Justice Holmes (*id.,* p. 357): "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by mak-

ing a contract about them. The contract will carry with it the infirmity of the subject matter." The general authority of the legislature to regulate, and thus to modify, the rates charged by public service corporations affords another illustration. *Stone* v. *Farmers Loan & Trust Co.*, 116 U.S. 307, 325, 326. In *Union Dry Goods Co.* v. *Georgia Public Service Corp.*, 248 U.S. 372, a statute fixing reasonable rates, to be charged by a corporation for supplying electricity to the inhabitants of a city, superseded lower rates which had been agreed upon by a contract previously made for a definite term between the company and a consumer. The validity of the statute was sustained. To the same effect are *Producers Transportation Co.* v. *Railroad Comm'n,* 251 U.S. 228, 232, and *Sutter Butte Canal Co.* v. *Railroad Comm'n,* 279 U.S. 125, 138. Similarly, where the protective power of the State is exercised in a manner otherwise appropriate in the regulation of a business it is no objection that the performance of existing contracts may be frustrated by the prohibition of injurious practices. *Rast* v. *Van Deman & Lewis Co.,* 240 U.S. 342, 363; see, also, *St. Louis Poster Advertising Co.* v. *St. Louis,* 249 U.S. 269, 274.

The argument is pressed that in the cases we have cited the obligation of contracts was affected only incidentally. This argument proceeds upon a misconception. The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. Another argument, which comes more closely to the point, is that the state power may be addressed directly to the prevention of the enforcement of contracts only when these are of a sort which the legislature in its discretion may denounce as being in themselves hostile to public morals, or public health, safety or welfare, or

where the prohibition is merely of injurious practices; that interference with the enforcement of other and valid contracts according to appropriate legal procedure, although the interference is temporary and for a public purpose, is not permissible. This is but to contend that in the latter case the end is not legitimate in the view that it cannot be reconciled with a fair interpretation of the constitutional provision.

Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the State to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake. See *American Land Co.* v. *Zeiss,* 219 U.S. 47. The reservation of state power appropriate to such extraordinary conditions may be deemed to be as much a part of all contracts, as is the reservation of state power to protect the public interest in the other situations to which we have referred. And if state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood or earthquake, that

power cannot be said to be non-existent when the urgent public need demanding such relief is produced by other and economic causes.

Whatever doubt there may have been that the protective power of the State, its police power, may be exercised—without violating the true intent of the provision of the Federal Constitution—in directly preventing the immediate and literal enforcement of contractual obligations, by a temporary and conditional restraint, where vital public interests would otherwise suffer, was removed by our decisions relating to the enforcement of provisions of leases during a period of scarcity of housing. *Block* v. *Hirsh,* 256 U.S. 135; *Marcus Brown Holding Co.* v. *Feldman,* 256 U.S. 170; *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U.S. 242. The case of *Block* v. *Hirsh, supra,* arose in the District of Columbia and involved the due process clause of the Fifth Amendment. The cases of the *Marcus Brown Company* and the *Levy Leasing Company* arose under legislation of New York and the constitutional provision against the impairment of the obligation of contracts was invoked. The statutes of New York,[15] declaring that a public emergency existed, directly interfered with the enforcement of covenants for the surrender of the possession of premises on the expiration of leases. Within the City of New York and contiguous counties, the owners of dwellings, including apartment and tenement houses (but excepting buildings under construction in September, 1920, lodging houses for transients and the larger hotels), were wholly deprived until November 1, 1922, of all possessory remedies for the purpose of removing from their premises the tenants or occupants in possession when the laws took effect (save in certain specified instances), providing the tenants or occupants were ready, able and willing to pay a reasonable rent or price for their use and

---

[15] Laws of 1920 (New York), chapters 942–947, 951.

occupation. *People* v. *La Fetra,* 230 N.Y. 429, 438; 130 N.E. 601; *Levy Leasing Co.* v. *Siegel, id.,* 634; 130 N.E. 923. In the case of the *Marcus Brown Company* the facts were thus stated by the District Court (269 Fed. 306, 312): " the tenant defendants herein, by law older than the state of New York, became at the landlord's option trespassers on October 1, 1920. Plaintiff had then found and made a contract with a tenant it liked better, and had done so before these statutes were enacted. By them plaintiff is, after defendants elected to remain in possession, forbidden to carry out his bargain with the tenant he chose, the obligation of the covenant for peaceable surrender by defendants is impaired, and for the next two years Feldman et al. may, if they like, remain in plaintiff's apartment, provided they make good month by month the allegation of their answer, i.e., pay what ' a court of competent jurisdiction ' regards as fair and reasonable compensation for such enforced use and occupancy." Answering the contention that the legislation as thus applied contravened the constitutional prohibition, this Court, after referring to its opinion in *Block* v. *Hirsh, supra,* said: " In the present case more emphasis is laid upon the impairment of the obligation of the contract of the lessees to surrender possession and of the new lease which was to have gone into effect upon October 1, last year. But contracts are made subject to this exercise of the power of the State when otherwise justified, as we have held this to be." 256 U.S. p. 198. This decision was followed in the case of the *Levy Leasing Company, supra.*

In these cases of leases, it will be observed that the relief afforded was temporary and conditional; that it was sustained because of the emergency due to scarcity of housing; and that provision was made for reasonable compensation to the landlord during the period he was

442

prevented from regaining possession. The Court also decided that while the declaration by the legislature as to the existence of the emergency was entitled to great respect, it was not conclusive; and, further, that a law " depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends. *Chastleton Corp.* v. *Sinclair,* 264 U.S. 543, 547, 548.

It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the State itself were touched only remotely, it has later been found that the fundamental interests of the State are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.

It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time

of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning—" We must never forget that it is *a constitution* we are expounding " (*McCulloch* v. *Maryland,* 4 Wheat. 316, 407)—" a constitution intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *Id.,* p. 415. When we are dealing with the words of the Constitution, said this Court in *Missouri* v. *Holland,* 252 U.S. 416, 433, " we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. . . . The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago."

Nor is it helpful to attempt to draw a fine distinction between the intended meaning of the words of the Constitution and their intended application. When we consider the contract clause and the decisions which have expounded it in harmony with the essential reserved power of the States to protect the security of their peoples, we find no warrant for the conclusion that the clause has been warped by these decisions from its proper significance or that the founders of our Government would have interpreted the clause differently had they had occasion to assume that responsibility in the conditions of the later day. The vast body of law which has been developed was unknown to the fathers, but it is believed to have preserved the essential content and the spirit of the Constitution. With a growing recognition of public needs

and the relation of individual right to public security, the court has sought to prevent the perversion of the clause through its use as an instrument to throttle the capacity of the States to protect their fundamental interests. This development is a growth from the seeds which the fathers planted. It is a development forecast by the prophetic words of Justice Johnson in *Ogden* v. *Saunders,* already quoted. And the germs of the later decisions are found in the early cases of the *Charles River Bridge* and the *West River Bridge, supra,* which upheld the public right against strong insistence upon the contract clause. The principle of this development is, as we have seen, that the reservation of the reasonable exercise of the protective power of the State is read into all contracts and there is no greater reason for refusing to apply this principle to Minnesota mortgages than to New York leases.

Applying the criteria established by our decisions we conclude:

1. An emergency existed in Minnesota which furnished a proper occasion for the exercise of the reserved power of the State to protect the vital interests of the community. The declarations of the existence of this emergency by the legislature and by the Supreme Court of Minnesota cannot be regarded as a subterfuge or as lacking in adequate basis. *Block* v. *Hirsh, supra.* The finding of the legislature and state court has support in the facts of which we take judicial notice. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 284 U.S. 248, 260. It is futile to attempt to make a comparative estimate of the seriousness of the emergency shown in the leasing cases from New York and of the emergency disclosed here. The particular facts differ, but that there were in Minnesota conditions urgently demanding relief, if power existed to give it, is beyond cavil. As the Supreme Court of Minnesota said, the economic emergency which threatened " the

loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence " was a " potent cause " for the enactment of the statute.

2. The legislation was addressed to a legitimate end, that is, the legislation was not for the mere advantage of particular individuals but for the protection of a basic interest of society.

3. In view of the nature of the contracts in question— mortgages of unquestionable validity—the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency and could be granted only upon reasonable conditions.

4. The conditions upon which the period of redemption is extended do not appear to be unreasonable. The initial extension of the time of redemption for thirty days from the approval of the Act was obviously to give a reasonable opportunity for the authorized application to the court. As already noted, the integrity of the mortgage indebtedness is not impaired; interest continues to run; the validity of the sale and the right of a mortgagee-purchaser to title or to obtain a deficiency judgment, if the mortgagor fails to redeem within the extended period, are maintained; and the conditions of redemption, if redemption there be, stand as they were under the prior law. The mortgagor during the extended period is not ousted from possession but he must pay the rental value of the premises as ascertained in judicial proceedings and this amount is applied to the carrying of the property and to interest upon the indebtedness. The mortgagee-purchaser during the time that he cannot obtain possession thus is not left without compensation for the withholding of possession. Also important is the fact that mortgagees, as is shown by official reports of which we may take notice, are predominantly corporations, such as

insurance companies, banks, and investment and mortgage companies.[16]   These, and such individual mortgagees as are small investors, are not seeking homes or the opportunity to engage in farming.   Their chief concern is the reasonable protection of their investment security.   It does not matter that there are, or may be, individual cases of another aspect.   The legislature was entitled to deal with the general or typical situation.   The relief afforded by the statute has regard to the interest of mortgagees as well as to the interest of mortgagors.   The legislation seeks to prevent the impending ruin of both by a considerate measure of relief.

In the absence of legislation, courts of equity have exercised jurisdiction in suits for the foreclosure of mortgages to fix the time and terms of sale and to refuse to confirm sales upon equitable grounds where they were found to be unfair or inadequacy of price was so gross as to shock the conscience.[17]   The "equity of redemption" is the creature of equity.   While courts of equity could not alter the legal effect of the forfeiture of the estate at common law on breach of condition, they succeeded, operating on the conscience of the mortgagee, in maintaining that it was unreasonable that he should retain for his own benefit what was intended as a mere security; that the breach of condition was in the nature of a penalty, which ought to be relieved against, and that the mortgagor had an equity to redeem on payment of principal, interest and costs,

---

[16] Department of Agriculture, Technical Bulletin No. 288, February, 1932, pp. 22, 23;   Year Book, Department of Agriculture, 1932, p. 913.

[17] *Graffman* v. *Burgess,* 117 U.S. 180, 191, 192; *Schroeder* v. *Young,* 161 U.S. 334, 337; *Ballentyne* v. *Smith,* 205 U.S. 285, 290; *Howell* v. *Baker,* 4 Johns. Ch. 118, 121; *Gilbert* v. *Haire,* 43 Mich. 283, 286; 5 N.W. 321; *Littell* v. *Zuntz,* 2 Ala. 256, 260, 262; *Farmer's Life Ins. Co.* v. *Stegink,* 106 Kans. 730; 189 Pac. 965; *Strong* v. *Smith,* 68 N.J.Eq. 650, 653; 58 Atl. 301, 64 *id.* 1135.   Compare *Suring State Bank* v. *Giese,* 210 Wis. 489; 246 N.W. 556.

notwithstanding the forfeiture at law. This principle of equity was victorious against the strong opposition of the common law judges, who thought that by " the Growth of Equity on Equity the Heart of the Common Law is eaten out." The equitable principle became firmly established and its application could not be frustrated even by the engagement of the debtor entered into at the time of the mortgage, the courts applying the equitable maxim " once a mortgage, always a mortgage, and nothing but a mortgage." [18] Although the courts would have no authority to alter a statutory period of redemption, the legislation in question permits the courts to extend that period, within limits and upon equitable terms, thus providing a procedure and relief which are cognate to the historic exercise of the equitable jurisdiction. If it be determined, as it must be, that the contract clause is not an absolute and utterly unqualified restriction of the State's protective power, this legislation is clearly so reasonable as to be within the legislative competency.

5. The legislation is temporary in operation. It is limited to the exigency which called it forth. While the postponement of the period of redemption from the foreclosure sale is to May 1, 1935, that period may be reduced by the order of the court under the statute, in case of a change in circumstances, and the operation of the statute itself could not validly outlast the emergency or be so extended as virtually to destroy the contracts.

We are of the opinion that the Minnesota statute as here applied does not violate the contract clause of the Federal Constitution. Whether the legislation is wise or

---

[18] See Coote's Law of Mortgages, 8th ed., vol. 1, pp. 11, 12; Jones on Mortgages, 8th ed., vol. 1, §§ 7, 8; *Langford* v. *Barnard*, Tothill, 134, temp. Eliz.; *Emmanuel College* v. *Evans*, 1 Rep. in Ch. 10, temp. Car. I; *Roscarrick* v. *Barton*, 1 Ca. in Ch. 217; *Noakes* v. *Rice*, (1902) A.C. 24, per Lord Macnaghten; *Fairclough* v. *Swan Brewery*, 81 L.J.P.C. 207.

unwise as a matter of policy is a question with which we are not concerned.

What has been said on that point is also applicable to the contention presented under the due process clause. *Block* v. *Hirsh, supra.*

Nor do we think that the statute denies to the appellant the equal protection of the laws. The classification which the statute makes cannot be said to be an arbitrary one. *Magoun* v. *Illinois Trust & Savings Bank,* 170 U.S. 283; *Clark* v. *Titusville,* 184 U.S. 329; *Quong Wing* v. *Kirkendall,* 223 U.S. 59; *Ohio Oil Co.* v. *Conway,* 281 U.S. 146; *Sproles* v. *Binford,* 286 U.S. 374.

The judgment of the Supreme Court of Minnesota is affirmed.

*Judgment affirmed.*

Mr. Justice Sutherland, dissenting.

Few questions of greater moment than that just decided have been submitted for judicial inquiry during this generation. He simply closes his eyes to the necessary implications of the decision who fails to see in it the potentiality of future gradual but ever-advancing encroachments upon the sanctity of private and public contracts. The effect of the Minnesota legislation, though serious enough in itself, is of trivial significance compared with the far more serious and dangerous inroads upon the limitations of the Constitution which are almost certain to ensue as a consequence naturally following any step beyond the boundaries fixed by that instrument. And those of us who are thus apprehensive of the effect of this decision would, in a matter so important, be neglectful of our duty should we fail to spread upon the permanent records of the court the reasons which move us to the opposite view.

A provision of the Constitution, it is hardly necessary to say, does not admit of two distinctly opposite inter-

pretations. It does not mean one thing at one time and an entirely different thing at another time. If the contract impairment clause, when framed and adopted, meant that the terms of a contract for the payment of money could not be altered *in invitum* by a state statute enacted for the relief of hardly pressed debtors to the end and with the effect of postponing payment or enforcement during and because of an economic or financial emergency, it is but to state the obvious to say that it means the same now. This view, at once so rational in its application to the written word, and so necessary to the stability of constitutional principles, though from time to time challenged, has never, unless recently, been put within the realm of doubt by the decisions of this court. The true rule was forcefully declared in *Ex parte Milligan*, 4 Wall. 2, 120–121, in the face of circumstances of national peril and public unrest and disturbance far greater than any that exist today. In that great case this court said that the provisions of the Constitution there under consideration had been expressed by our ancestors in such plain English words that it would seem the ingenuity of man could not evade them, but that after the lapse of more than seventy years they were sought to be avoided. " Those great and good men," the court said, " foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future." And then, in words the power and truth of which have become increasingly evident with the lapse of time, there was laid down the rule without which the Constitution would cease to be the " supreme law of the land," binding equally upon governments and governed at all times

and under all circumstances, and become a mere collection of political maxims to be adhered to or disregarded according to the prevailing sentiment or the legislative and judicial opinion in respect of the supposed necessities of the hour:

"The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, . . ."

Chief Justice Taney, in *Dred Scott* v. *Sandford*, 19 How. 393, 426, said that while the Constitution remains unaltered it must be construed now as it was understood at the time of its adoption; that it is not only the same in words but the same in meaning, "and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day." And in *South Carolina* v. *United States*, 199 U.S. 437, 448–449, in an opinion by Mr. Justice Brewer, this court quoted these words with approval and said:

"The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now . . . Those things which are within its grants of power, as those grants were understood when made, are still within them, and those things not within them remain still excluded."

The words of Judge Campbell, speaking for the Supreme Court of Michigan in *Twitchell* v. *Blodgett,* 13 Mich. 127, 139–140, are peculiarly apposite. " But it may easily happen," he said, " that specific provisions may, in unforeseen emergencies, turn out to have been inexpedient. This does not make these provisions any less binding. Constitutions can not be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of Government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not competent for any department of the Government to change a constitution, or declare it changed, simply because it appears ill adapted to a new state of things.

". . . Restrictions have, it is true, been found more likely than grants to be unsuited to unforeseen circumstances . . . But, where evils arise from the application of such regulations, their force cannot be denied or evaded; and the remedy consists in repeal or amendment, and not in false constructions."

The provisions of the Federal Constitution, undoubtedly, are pliable in the sense that in appropriate cases they have the capacity of bringing within their grasp every new condition which falls within their meaning.[1] But, their *meaning* is changeless; it is only their *application* which is extensible. See *South Carolina* v. *United States, supra,* pp. 448–449. Constitutional grants of

---

[1] In such cases it is no more necessary to modify constitutional rules to govern new conditions than it is to create new words to describe them. The commerce clause is a good example. When that was adopted its application was necessarily confined to the regulation of the primitive methods of transportation then employed; but railroads, automobiles and aircraft automatically were brought within the scope and subject to the terms of the commerce clause the moment these new means of transportation came into existence, just as they were at once brought within the meaning of the word " carrier," as defined by the dictionaries.

power and restrictions upon the exercise of power are not flexible as the doctrines of the common law are flexible. These doctrines, upon the principles of the common law itself, modify or abrogate themselves whenever they are or whenever they become plainly unsuited to different or changed conditions. *Funk* v. *United States, ante,* p. 371. The distinction is clearly pointed out by Judge Cooley, 1 Constitutional Limitations, 8th ed., 124:

"A principal share of the benefit expected from written constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. Those beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular, and pervading in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. . . . What a court is to do, therefore, is *to declare the law as written,* leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted,

and it is not different at any subsequent time when a court has occasion to pass upon it."

The whole aim of construction, as applied to a provision of the Constitution, is to discover the meaning, to ascertain and give effect to the intent, of its framers and the people who adopted it. *Lake County* v. *Rollins,* 130 U.S. 662, 770. The necessities which gave rise to the provision, the controversies which preceded, as well as the conflicts of opinion which were settled by its adoption, are matters to be considered to enable us to arrive at a correct result. *Knowlton* v. *Moore,* 178 U.S. 41, 95. The history of the times, the state of things existing when the provision was framed and adopted, should be looked to in order to ascertain the mischief and the remedy. *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 723; *Craig* v. *Missouri,* 4 Pet. 410, 431–432. As nearly as possible we should place ourselves in the condition of those who framed and adopted it. *Ex parte Bain,* 121 U.S. 1, 12. And if the meaning be at all doubtful, the doubt should be resolved, wherever reasonably possible to do so, in a way to forward the evident purpose with which the provision was adopted. *Maxwell* v. *Dow,* 176 U.S. 581, 602; *Jarrolt* v. *Moberly,* 103 U.S. 580, 586.

An application of these principles to the question under review removes any doubt, if otherwise there would be any, that the contract impairment clause denies to the several states the power to mitigate hard consequences resulting to debtors from financial or economic exigencies by an impairment of the obligation of contracts of indebtedness. A candid consideration of the history and circumstances which led up to and accompanied the framing and adoption of this clause will demonstrate conclusively that it was framed and adopted with the specific and studied purpose of preventing legislation designed to relieve debtors *especially* in time of financial distress. In-

deed, it is not probable that any other purpose was definitely in the minds of those who composed the framers' convention or the ratifying state conventions which followed, although the restriction has been given a wider application upon principles clearly stated by Chief Justice Marshall in the *Dartmouth College Case,* 4 Wheat. 518, 644–645.

Following the Revolution, and prior to the adoption of the Constitution, the American people found themselves in a greatly impoverished condition. Their commerce had been well-nigh annihilated. They were not only without luxuries, but in great degree were destitute of the ordinary comforts and necessities of life. In these circumstances they incurred indebtedness in the purchase of imported goods and otherwise, far beyond their capacity to pay. From this situation there arose a divided sentiment. On the one hand, an exact observance of public and private engagements was insistently urged. A violation of the faith of the nation or the pledges of the private individual, it was insisted, was equally forbidden by the principles of moral justice and of sound policy. Individual distress, it was urged, should be alleviated only by industry and frugality, not by relaxation of law or by a sacrifice of the rights of others. Indiscretion or imprudence was not to be relieved by legislation, but restrained by the conviction that a full compliance with contracts would be exacted. On the other hand, it was insisted that the case of the debtor should be viewed with tenderness; and efforts were constantly directed toward relieving him from an exact compliance with his contract. As a result of the latter view, state laws were passed suspending the collection of debts, remitting or suspending the collection of taxes, providing for the emission of paper money, delaying legal proceedings, etc. There followed, as there must always follow from such a course, a long trail of ills, one of the direct

consequences being a loss of confidence in the government and in the good faith of the people. Bonds of men whose ability to pay their debts was unquestionable could not be negotiated except at a discount of thirty, forty, or fifty per cent. Real property could be sold only at a ruinous loss. Debtors, instead of seeking to meet their obligations by painful effort, by industry and economy, began to rest their hopes entirely upon legislative interference. The impossibility of payment of public or private debts was widely asserted, and in some instances threats were made of suspending the administration of justice by violence. The circulation of depreciated currency became common. Resentment against lawyers and courts was freely manifested, and in many instances the course of the law was arrested and judges restrained from proceeding in the execution of their duty by popular and tumultous assemblages. This state of things alarmed all thoughtful men, and led them to seek some effective remedy. Marshall, Life of Washington (1807), Vol. 5, pp. 88–131.

That this brief outline of the situation is entirely accurate is borne out by all contemporaneous history, as well as by writers of distinction of a later period.[2] Compare

[2] Thus McMaster (History of the People of the United States, Vol. 1, p. 425)—after referring to the conditions in Rhode Island, where "the bonds of society were dissolved by paper money and tender laws"; in New Jersey, where the people nailed up the doors of their court houses; in Virginia, where the debtors "set fire to theirs in order to stop the course of justice"—says:

"The newspapers were full of bankrupt notices. The farmers' taxes amounted to near the rent of their farms. Mechanics wandered up and down the streets of every city destitute of work. Ships, shut out from every port of Europe, lay rotting in the harbors."

Channing (History of the United States, Vol. III, pp. 410–411, 482–483) paints this graphic picture of the situation:

"Nowhere was the immediate prospect more gloomy than in South Carolina. . . . In Massachusetts, at the other end of the line, the

456

*Edwards* v. *Kearzey,* 96 U.S. 595, 604–607. The appended note might be extended for many pages by the addition of similar quotations from the same and other' writers, but enough appears to establish beyond all ques-

case was as bad, if not worse . . . the resources of New England were insufficient to pay even what was then owing. The case of New York was even more desperate, and for the moment Philadelphia alone seemed prosperous, for the wastage of the later years of the war had been severely felt in Virginia. . . .

" . . . Virginia was honeycombed with debt. . . .

" In South Carolina, the planters were even more heavily in debt. . . . The case of Thomas Bee is to the point. His creditors had secured executions against him; the sheriff had seized his property and had sold it at one-thirteenth of what it would have brought at private sale in ordinary times."

Nevins (The American States During and After the Revolution, p. 536) says:

" The town of Greenwich computed that during each of the five years preceding 1786 the farmers had paid in taxes the entire rental value of their land."

John Fiske (The Critical Period of American History, 8th ed., pp. 175, 180) thus describes conditions:

". . . about the market-places men spent their time angrily discussing politics, and scarcely a day passed without street-fights, which at times grew into riots. In the country, too, no less than in the cities, the goddess of discord reigned. The farmers determined to starve the city people into submission, and they entered into an agreement not to send any produce into the cities until the merchants should open their shops and begin selling their goods for paper [money] at its face value. . . . the farmers threw away their milk, used their corn for fuel, and let their apples rot on the ground. . . .

". . . the courts were broken up by armed mobs. At Concord one Job Shattuck brought several hundred armed men into the town and surrounded the court-house, while in a fierce harangue he declared that the time had come for wiping out all debts."

Dr. David Ramsay (History of the United States, 2d ed., 1818, Vol. III, pp. 46–47), a member of the old Congress under the Confederation, and who lived in the midst of the events of which he speaks, says:

tion the extreme gravity of the emergency, the great diffi-
culty and frequent impossibility which confronted debtors
generally in any effort to discharge their obligations.

"The non-payment of public debts sometimes inferred a necessity,
and always furnished an apology, for not discharging private con-
tracts. Confidence between man and man received a deadly wound.
Public faith being first violated, private engagements lost much of
their obligatory force. . . .

"From the combined operation of these causes trade languished;
credit expired; gold and silver vanished; and real property was
depreciated to an extent equal to that of the depreciation of
continental money, . . ."

And, finally, George Ticknor Curtis, in his History of the Origin,
Formation, and Adoption of the Constitution of the United States,
Vol. 1, pp. 332–333:

"All contemporary evidence assures us that this [1783 to 1787] was
a period of great pecuniary distress, arising from the depreciation of
the vast quantities of paper money issued by the Federal and State
governments; from rash speculations; from the uncertain and fluctu-
ating condition of trade; and from the great amount of foreign goods
forced into the country as soon as its ports were opened. Naturally,
in such a state of things, the debtors were disposed to lean in favor of
those systems of government and legislation which would tend to re-
lieve or postpone the payment of their debts; and as such relief could
come only from their State governments, they were naturally the
friends of State rights and State authority, and were consequently not
friendly to any enlargement of the powers of the Federal Constitu-
tion. The same causes which led individuals to look to legislation for
irregular relief from the burden of their private contracts, led them
also to regard public obligations with similar impatience. Opposed
to this numerous class of persons were all those who felt the high
necessity of preserving inviolate every public and private obligation;
who saw that the separate power of the States could not accomplish
what was absolutely necessary to sustain both public and private
credit; and they were as naturally disposed to look to the resources
of the Union for these benefits, as the other class were to look in an
opposite direction. These tendencies produced, in nearly every State,
a struggle, not as between two organized parties, but one that was all
along a contest for supremacy between opposite opinions, in which it
was at one time doubtful to which side the scale would turn."

In an attempt to meet the situation recourse was had
to the legislatures of the several states under the Confed-
eration; and these bodies passed, among other acts, the
following: laws providing for the emission of bills of
credit and making them legal tender for the payment of
debts, and providing also for such payment by the de-
livery of specific property at a fixed valuation; instalment
laws, authorizing payment of overdue obligations at fu-
ture intervals of time; stay laws and laws temporarily
closing access to the courts; and laws discriminating
against British creditors. I have selected, out of a vast
number, a few historical comments upon the character
and effect of these legislative devices.[3]

[3] Charles Warren, The Making of the Constitution, pp. 5–6:

" The actual evils which led to the Federal Convention of 1787 are
familiar to every reader of history and need no detailed description
here. As is well known, they arose, in general, . . . ; second, from
State legislation unjust to citizens and productive of dissensions with
neighboring States—the State laws particularly complained of being
those staying process of the Courts, making property a tender in pay-.
ment of debts, issuing paper money, interfering with foreclosure of
mortgages, . . ."

Fiske, *supra*, note 2, p. 168:

" By 1786, under the universal depression and want of confidence,
all trade had well-nigh stopped, and political quackery, with its cheap
and dirty remedies, had full control of the field. . . . a craze for fic-
titious wealth' in the shape of paper money ran like an epidemic
through the country. There was a Barmecide feast of economic
vagaries; . . . And when we have threaded the maze of this rash
legislation, we shall the better understand that clause in our federal
constitution which forbids the making of laws impairing the obligation
of contracts."

Beard, An Economic Interpretation of the Constitution of the
United States, pp. 31–32:

" Money capital was . . . being positively attacked by the makers
of paper money, stay laws, pine barren acts, and other devices for
depreciating the currency or delaying the collection of debts. In addi-
tion there was a widespread derangement of the monetary system . . .

In the midst of this confused, gloomy, and seriously exigent condition of affairs, the Constitutional Convention of 1787 met at Philadelphia. The defects of the Articles of Confederation were so great as to be beyond all hope of amendment, and the Convention, acting in technical excess of its authority, proceeded to frame for submission to the people of the several states an entirely new Constitution. Shortly prior to the meeting of the Convention, Madison had assailed a bill pending in the Virginia Assembly, proposing the payment of private debts in three annual instalments, on the ground that " no legislative principle could vindicate such an interposition

---

" Creditors, naturally enough, resisted all of these schemes in the state legislatures, and . . . turned to the idea of a national government so constructed as to prevent laws impairing the obligation of contract, emitting paper money, and otherwise benefiting debtors. It is idle to inquire whether the rapacity of the creditors or the total depravity of the debtors . . . was responsible for this deep and bitter antagonism. It is sufficient for our purposes to discover its existence and to find its institutional reflex in the Constitution."

Fisher Ames, " Eulogy on Washington," The Life and Works of Fisher Ames, Vol. II, p. 76:

" Accordingly, in some of the States, creditors were treated as outlaws; bankrupts were armed with legal authority to be persecutors; and by the shock of all confidence and faith, society was shaken to its foundations."

Illuminating comment upon some of this state legislation is to be found in Chapter VI (Vol. I) of Bancroft's " History of the Formation of the Constitution of the United States," under the heading, " State Laws Impairing the Obligation of Contracts Prove the Need of an Overruling Union," pp. 230–236:

" [In Massachusetts] Repeated temporary stay-laws gave no real relief; they flattered and deceived the hope of the debtor, exasperating alike him and his creditor. . . .

". . . [In Pennsylvania] in December, 1784, debts contracted before 1777 were made payable in three annual instalments. . . .

" Maryland, . . . . In 1782 . . . enacted a stay-law extending to January, 1784, . . .

of the law in private contracts." The bill was lost by a single vote.[4] Pelatiah Webster had likewise assailed similar laws as altering the value of contracts'; and William Paterson, of New Jersey, had insisted that " the legislature should leave the parties to the law under which they contracted." [5]

In the plan of government especially urged by Sherman and Ellsworth there was an article proposing that the legislatures of the individual states ought not to possess a right to emit bills of credit, etc., " or in any manner to obstruct or impede the recovery of debts, whereby the

---

" Georgia, in August, 1782, stayed execution for two years from and after the passing of the act. . . .

". . . [In South Carolina in 1782] the commencement of suits was suspended till ten days after the sitting of the next general assembly. . . . On the twenty-sixth day of March, 1784, came the great ordinance for the payment of debts in four annual instalments, . . ."

Ramsay, *supra,* note 2, Vol. 3, 65–66, 106:

" The distrust which prevailed among the people, respecting the punctual fulfilment of contracts, arose from the powers claimed, and, in too many instances, exercised by the state legislatures, for impairing the obligation of contracts; . . . These prolific sources of evil were completely done away by the new constitution. . . .

". . . State legislatures, in too many instances, yielded to the necessities of their constituents, and passed laws, by which creditors were compelled, either to wait for payment of their just demands, on the tender of security, or to take property, at a valuation, or paper money falsely purporting to be the representative of specie. These laws were considered, by the British, as inconsistent with . . . the treaty, . . . The Americans palliated these measures, by the plea of necessity; . . ."

Ramsay, The History of South-Carolina (1809), Vol. II, pp. 429–430:

" The effects of these laws, interfering between debtors and creditors, were extensive. They destroyed public credit and confidence between man and man; injured the morals of the people, and in many instances ensured and aggravated the final ruin of the unfortunate debtors for whose temporary relief they were brought forward."

[4] Bancroft, *supra,* note 3, Vol. I, p. 239.

[5] *Id.,* Vol. I, p. 241.

interests of foreigners or the citizens of any other state may be affected." [6]  And on July 13, 1787, Congress in New York, acutely conscious of the evils engendered by state laws interfering with existing contracts,[7] passed the Northwest Territory Ordinance, which contained the clause: "And, in the just preservation of rights and property, it is understood and declared, that no law ought ever to be made or have force in the said territory, that shall, in any manner whatever, interfere with or affect private contracts, or engagements, *bona fide,* and without fraud previously formed." [8]  It is not surprising, therefore, that, after the Convention had adopted the clauses, no state shall " emit bills of credit," or " make any thing but gold and silver coin a tender in payment of debts," Mr. King moved to add a " prohibition on the states to interfere in private contracts."  This was opposed by Gouverneur Morris and Colonel Mason.  Colonel Mason thought that this would be carrying the restraint too far; that cases would happen that could not be foreseen where some kind of interference would be essential.  This was on August 28.  But Mason's view did not prevail, for, on September 14 following, the first clause of Art. I, § 10, was altered so as to include the provision, " No state shall . . . pass any . . . law impairing the obligation of contracts," and in that form it was adopted.[9]

Luther Martin, in an address to the Maryland House of Delegates, declared his reasons for voting against the provision.  He said that he considered there might be times of such great public calamity and distress as should ren-

---

[6] *Id.,* Vol. II, p. 136.

[7] See Curtis, *supra,* note 2, Vol. 2, pp. 366–367.

[8] Ordinance for the Government of the Territory of the United States Northwest of the River Ohio, Art. II; Thorpe, American Charters, Constitutions and Organic Laws, Vol. 2, pp. 957, 961.

[9] Elliott's Debates, Vol. V, pp. 485, 488, 545, 546; *id.,* Vol. I, pp. 271, 311; Farrand, The Records of the Federal Convention, Vol. II, pp. 439–440, 596–597, 610.

der it the duty of a government in some measure to interfere by passing laws totally or partially stopping courts of justice, or authorizing the debtor to pay by instalments; that such regulations had been found necessary in most or all of the states " to prevent the wealthy creditor and the moneyed man from totally destroying the poor, though industrious debtor. Such times may again arrive." And he was apprehensive of any proposal which took from the respective states the power to give their debtor citizens " a moment's indulgence, however necessary it might be, and however desirous to grant them aid." [10]

On the other hand, Sherman and Ellsworth defended the provision in a letter to the Governor of Connecticut.[11] In the course of the Virginia debates, Randolph declared that the prohibition would be promotive of virtue and justice, and preventive of injustice and fraud; and he pointed out that the reputation of the people had suffered because of frequent interferences by the state legislatures with private contracts.[12] In the North Carolina debates, Mr. Davie declared that the prohibition against impairing the obligation of contracts and other restrictions ought to supersede the laws of particular states. He thought the constitutional provisions were founded on the strongest principles of justice.[13] Pinckney, in the South Carolina debates, said that he considered the section including the clause in question as " the soul of the Constitution," teaching the states " to cultivate those principles of public honor and private honesty which are the sure road to national character and happiness." [14]

---

[10] Elliot's Debates, Vol. I, pp. 344, 376–377.

[11] Id., Vol. I, pp. 491–492.

[12] Id., Vol. III, p. 478.

[13] Id., Vol. IV, pp. 156, 191.

[14] Id., Vol. IV, p. 333.

Mr. Warren, in his book, " The Making of the Constitution," pp. 552–555, has an interesting resume of the proceedings in the Conven-

The provision was strongly defended in The Federalist, both by Hamilton in No. 7 and Madison in No. 44. Madison concluded his defense of the clause by saying:

tion and of the conflicting views which were before the state conventions for consideration. He says in part:

" The Convention then was asked to perfect their action in favor of honesty and morality, by adding a prohibition on the States which would put an end to statutes enacting laws for special individuals, setting aside Court judgments, repealing vested rights, altering corporate charters, staying the bringing or prosecution of suits, preventing foreclosure of mortgages, altering the terms of contracts, and allowing tender in payment of debts of something other than that contracted for. The State Legislatures had hitherto passed such laws in abundant measure, and the situation was graphically described later by Chief Justice Marshall in one of his most noted decisions [*Ogden* v. *Saunders*, 12 Wheat. 213, 354], as follows:

" ' The power of changing the relative situation of debtor and creditor, of interfering with contracts, a power which comes home to every man, touches the interest of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, had been used to such an excess by the State Legislatures as to break in upon the ordinary intercourse of society and destroy all confidence between man and man. The mischief had become so great, so alarming, as not only to impair commercial intercourse and threaten the existence of credit, but to sap the morals of the people and destroy the sanctity of private faith. To guard against the continuance of the evil was an object of deep interest with all the truly wise as well as virtuous of this great community, and was one of the important benefits expected from a reform of the government.'

" To obviate the conditions thus described, King of Massachusetts proposed the insertion of a new restriction on the States. . . . Wilson and Madison supported his motion. Mason and G. Morris, however, believed that it went too far in interfering with the powers of the States. . . . There was also a genuine belief by some delegates that, under some circumstances and in financial crises, such stay and tender laws might be necessary to avert calamitous loss to debtors. . . . The other delegates had been deeply impressed by the disastrous social and economic effects of the stay and tender laws which had been enacted by most of the States between 1780 and 1786, and they decided to make similar legislation impossible in the future."

". . . one legislative interference is but the first link of a long chain of repetitions, every subsequent interference being naturally produced by the effects of the preceding. They very rightly infer, therefore, that some thorough reform is wanting, which will banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society."

Contemporaneous history is replete with evidence of the sharp conflict of opinion with respect to the advisability of adopting the clause. Dr. Ramsay (The History of South-Carolina (1809), Vol. II, pp. 431–433), already referred to, writing of the action of South Carolina and especially referring to the contract impairment clause, says that this Constitution was accepted and ratified on behalf of the state, and speaks of it as an act of great self-denial:

" The power thus given up by South-Carolina, was one she thought essential to her welfare, and had freely exercised for several preceding years. Such a relinquishment she would not have made at any period of the last five years; for in them she had passed no less than six acts interfering between debtor and creditor, with the view of obtaining a respite for the former under particular circumstances of public distress. To tie up the hands of future legislatures so as to deprive them of a power of repeating similar acts on any emergency, was a display both of wisdom and magnanimity. It would seem as if experience had convinced the state of its political errors, and induced a willingness to retrace its steps and relinquish a power which had been improperly used."

There is an old case, *Glaze* v. *Drayton,* 1 Desaus. Eq. (S.C.) 109, decided in 1784, where the South Carolina court of chancery entered a decree for the specific performance of a contract for the purchase of land, but providing for the payment of the balance due under the con-

tract " by instalments, at the times mentioned in the acts of assembly respecting the recovery of old debts." In reporting that case soon after the adoption of the Constitution, Chancellor Desaussure added the following explanatory and illuminating note [p. 110]:

" The legislature, in consideration of the distressed state of the country, after the war, had passed an act, preventing the immediate recovery of debts, and fixing certain periods for the payment of debts, far beyond the periods fixed by the contract of the parties. These interferences with private contracts, became very common with most of the state legislatures, even after the distresses arising from the war had ceased in a great degree. They produced distrust and irritation throughout the community, to such an extent, that new troubles were apprehended; and nothing contributed more to prepare the public mind for giving up a portion of the state sovereignty, and adopting an efficient national government, than these abuses of power by the state legislatures."

If it be possible by resort to the testimony of history to put any question of constitutional intent beyond the domain of uncertainty, the foregoing leaves no reasonable ground upon which to base a denial that the clause of the Constitution now under consideration was meant to foreclose state action impairing the obligation of contracts *primarily and especially* in respect of such action aimed at giving relief to debtors *in time of emergency.* And if further proof be required to strengthen what already is inexpugnable, such proof will be found in the previous decisions of this court. There are many such decisions; but it is necessary to refer to a few only which bear directly upon the question, namely: *Bronson* v. *Kinzie,* 1 How. 311; *McCracken* v. *Hayward,* 2 How. 608; *Gantly's Lessee* v. *Ewing,* 3 How. 707; *Howard* v. *Bugbee,* 24 How. 461; *Gunn* v. *Barry,* 15 Wall. 610; *Walker* v. *Whitehead,*

16 Wall. 314; *Edwards* v. *Kearzey*, 96 U.S. 595; *Barnitz* v. *Beverly*, 163 U.S. 118; and *Bradley* v. *Lightcap*, 195 U.S. 1.

*Bronson* v. *Kinzie* was decided at the January Term, 1843. The case involved an Illinois statute, extending the period of redemption for a period of twelve months after a sale under a decree in chancery, and another statute preventing a sale unless two-thirds of the amount at which the property had been valued by appraisers should be bid therefor. This court held both statutes invalid, when applied to an existing mortgage, as infringing the contract impairment clause. No more need now be said as to the points decided. The opinion of the court says nothing about an emergency; but it is clear that the statute was passed for the purpose of meeting the panic and depression which began in 1837 and continued for some years thereafter.[15] And in the light of what is now to be said, it is evident that the question of that emergency as a basis for the legislation was so definitely involved that it must have been considered by the court.

The emergency was quite as serious as that which the country has faced during the past three years. Indeed, it was so great that in one instance, at least, a state repudiated a portion of its public debt, and others were strongly tempted to do so.[16] Mr. Warren, in his book, " The Supreme Court in United States History," Vol. 2, pp. 376–379, gives a vivid picture of the situation. After referring to *Bronson* v. *Kinzie* and the statute extending the period of redemption therein dealt with, he points to the prevailing state of business and finance

---

[15] See Dewey, Financial History of the United States, p. 229, *et seq.;* Schouler, History of the United States, Vol. IV, p. 276, *et seq.;* McMaster, *supra,* note 2, Vol. VI, pp. 389, *et seq.,* 523, *et seq.,* 623, *et seq.*

[16] See Dewey, *supra,* note 15, p. 243, *et seq.;* McMaster, *supra,* note 2, Vol. VI, p. 627, *et seq.,* Vol. VII, p. 19, *et seq.;* Centennial History of Illinois, Vol. II, p. 231, *et seq.*

which had called the statute into existence; to the bank failures, state debt repudiations, scarcity of hard money, the inability to pay debts except by disposing of property at ruinous prices; to the enactment of statutes for the relief of debtors, stay laws postponing collection of debts, etc., which had been passed by state after state; and to the action of this court in striking down the state statute in the face of these conditions.

" Unquestionably," he continues, " the country owes much of its prosperity to the unflinching courage with which, in the face of attack, the Court has maintained its firm stand in behalf of high standards of business morale, requiring honest payment of debts and strict performance of contracts; and its rigid construction of the Constitution to this end has been one of the glories of the Judiciary. That its decisions should, at times, have met with disfavor among the debtor class was, however, entirely natural; and while, ultimately, these debtor-relief-laws have always proved to be injurious to the very class they were designed to relieve and to increase the financial distress, fraud and extortion, temporarily, debtors have always believed such laws to be their salvation and have resented judicial decisions holding them invalid. Consequently, this opinion of the Court in the *Bronson Case* aroused great antagonism in the Western States. In Illinois, a mass meeting was held which resolved that the decision ought not to be heeded, . . . Later, deference to the antagonism aroused against the Court by this decision was made when the Senator from Illinois, James Semple, introduced in the Senate in 1846, a joint resolution proposing a Constitutional Amendment to prohibit the Supreme Court from declaring void ' any Act of Congress or any State regulation on the ground that it is contrary to the Constitution of the United States . . .' "

McMaster (*supra*, note 2), Vol. VII, pp. 44-48, is to the same effect.

*McCracken* v. *Hayward,* decided at the January Term, 1844, dealt with the same Illinois statute; but involved a sale on execution after judgment, whereas *Bronson* v. *Kinzie* involved a mortgage. The decision simply followed the *Bronson* case. What has been said in respect of the background and setting of that case is equally applicable and need not be repeated.

*Gantly's Lessee* v. *Ewing* was decided at the January Term, 1845. It held unconstitutional, as applied to a preëxisting mortgage, an act of Indiana providing that no real property should be sold on execution for less than half its appraised value. The statute, like those of Illinois, was enacted for the benefit of hard-pressed debtors as a result of the same emergency. It is referred to by McMaster, *supra,* as one of the "marks on the statute books" which the "evil times through which the people were passing" had left.

*Howard* v. *Bugbee,* decided at the December Term, 1860, dealt with an Alabama statute authorizing a redemption of mortgaged property in two years after the sale under a decree. The statute was declared unconstitutional principally upon the authority of *Bronson* v. *Kinzie.* The opinion is very short and does not refer to the question of emergency. The statute was passed, however, in 1842 (the mortgage having been executed prior thereto), and was, therefore, one of the emergency statutes of that period. The Alabama Supreme Court, whose decision was under review here, so treated it, and justified the statute upon that ground. 32 Ala. 713, 716–717. It is worthy of note that after the decision of this court in the *Bugbee* case, Judge Walker, who delivered the opinion therein for the Alabama court, filed a dissenting opinion in *Ex parte Pollard, Ex parte Woods,* 40 Ala. 77, 110, in the course of which he said that his former opinion had been overruled by this court and he could no longer perceive

any ground upon which the convictions of a legislature as to the welfare of the people could enlarge the authority to interfere, through the manipulation of the remedy, with the obligation of contracts. The basis of the legislation was, and is shown by the decision of the Alabama Supreme Court sustaining it to be, the existence of the great emergency beginning in 1837; and that question, since the Alabama decision was reviewed, was quite plainly before this court for consideration.

*Walker* v. *Whitehead,* decided at the December Term, 1872, held unconstitutional a Georgia statute requiring the plaintiff, suing on a debt or contract, to prove as a condition precedent to the entry of judgment in his favor that all legal taxes chargeable by law thereon had been duly paid for each year since the making of the debt or contract. The Georgia Supreme Court, 43 Ga. 538, 544–546, had sustained the act as a measure made necessary by the desperate financial and economic conditions in that state due to the Civil War. This court, making no response to the somewhat fervid presentation of this view of the matter by the state court, simply said that the degree of impairment was immaterial; that any impairment of the obligation of a contract is within the prohibition of the Constitution; that "A clearer case of a law impairing the obligation of a contract, within the meaning of the Constitution, can hardly occur."

*Edwards* v. *Kearzey,* decided at the October Term, 1877, held invalid, as applied to a preëxisting debt, the provision of the North Carolina constitution of 1868 increasing the exemptions to which a debtor was entitled. The North Carolina Supreme Court, in a series of decisions, had sustained the state constitutional provision, principally upon the ground (*Garrett* v. *Chesire,* 69 N.C. 396, 404–405) that it was adopted at a time when " probably one-half of the debtor class are owing more *old* debts than

they can pay "; and that " If under our circumstances our people are to be left without any exemptions, the policy of christian civilization is lost sight of, . . ." In the brief of defendant in error in this court (pp. 7–8) the view was strongly urged that the provision was not so much for the benefit of the debtor as for that of the state, to prevent the evils of almost universal pauperism. Attention was called to the desperate condition of the people of the state following the Civil War, and it was said that one-third of the whole population were paupers, all their property except lands having disappeared; that one-half of the people did not own land enough to afford burial for that proportion of the population; and against those who did own land the ante-war debts were piled mountain high. It was submitted that the state, on being rehabilitated, was not bound to allow the creditor to strip the few self-supporting land owners of their means of existence and thereby add them to the vast army of the impoverished; but that it had the right to defer a portion of the creditor's claim until the prostrated community had opportunity to recoup some of its losses.

This court, in response, reviewed the history of the adoption of the contract impairment clause and held the state constitutional provision invalid. " ' Policy and humanity,' " it said, " are dangerous guides in the discussion of a legal proposition. He who follows them far is apt to bring back the means of error and delusion. *The prohibition contains no qualification, and we have no judicial authority to interpolate any.* Our duty is simply to execute it." [Italics added.]

*Barnitz* v. *Beverly* was decided May 18, 1896. A law of Kansas extended the period of redemption from a sale under a mortgage for a period of eighteen months, during which time the mortgagor was to remain in possession and receive rents and profits, except as necessary for repairs.

The act was passed in 1893 in the midst of another panic, the severity of which, still within the memory of the members of this court, is a matter of common knowledge. The effects of that panic extended into every form of industry; bank failures were on an unprecedented scale; more than half the railroads of the country were in the hands of receivers; securities fell to fifty per cent., often to twenty-five per cent., of their former value; commercial failures and unemployment became general; heavy inroads were made upon public and private resources in caring for the hungry and destitute; [17] great bodies of idle men—the so-called " industrial armies "—marched toward Washington, feeding like locusts upon the country through which they passed.

These conditions were brought to the attention of this court. In addition, the Supreme Court of Kansas, 55 Kans. 466, 484–485; 42 Pac. 725, 731, had relied upon them as a justification for the legislation, and had inquired why the state legislature in a time of general depression could not " extend the indefinite estate impliedly reserved by the mortgagor, as the federal courts of equity do in particular cases, beyond the six months allowed by the general practice?"

In response to all of which, this court, after reviewing its former decisions, held the statute invalid as applied to a sale under a mortgage executed before its passage.

The present exigency is nothing new. From the beginning of our existence as a nation, periods of depression, of industrial failure, of financial distress, of unpaid and unpayable indebtedness, have alternated with years of plenty. The vital lesson that expenditure beyond income begets poverty, that public or private extrava-

---

[17] See Dewey, *supra*, note 15, p. 444, *et seq.*; Andrews, The Last Quarter Century in the United States, Vol. II, p. 301, *et seq.*

gance, financed by promises to pay, either must end in complete or partial repudiation or the promises be fulfilled by self-denial and painful effort, though constantly taught by bitter experience, seems never to be learned; and the attempt by legislative devices to shift the misfortune of the debtor to the shoulders of the creditor without coming into conflict with the contract impairment clause has been persistent and oft-repeated.

The defense of the Minnesota law is made upon grounds which were discountenanced by the makers of the Constitution and have many times been rejected by this court. That defense should not now succeed, because it constitutes an effort to overthrow the constitutional provision by an appeal to facts and circumstances identical with those which brought it into existence. With due regard for the processes of logical thinking, it legitimately cannot be urged that conditions which produced the rule may now be invoked to destroy it.

The lower court, and counsel for the appellees in their argument here, frankly admitted that the statute does constitute a material impairment of the contract, but contended that such legislation is brought within the state power by the present emergency. If I understand the opinion just delivered, this court is not wholly in accord with that view. The opinion concedes that emergency does not create power, or increase granted power, or remove or diminish restrictions upon power granted or reserved. It then proceeds to say, however, that while emergency does not create power, it may furnish the occasion for the exercise of power. I can only interpret what is said on that subject as meaning that while an emergency does not diminish a restriction upon power it furnishes an occasion for diminishing it; and this, as it seems to me, is merely to say the same thing by the use of another set of words, with the effect of affirming that which has just been denied.

It is quite true that an emergency may supply the occasion for the exercise of power, depending upon the nature of the power and the intent of the Constitution with respect thereto. The emergency of war furnishes an occasion for the exercise of certain of the war powers. This the Constitution contemplates, since they cannot be exercised upon any other occasion. The existence of another kind of emergency authorizes the United States to protect each of the states of the Union against domestic violence. Const. Art. IV, § 4. But we are here dealing not with a power granted by the Federal Constitution, but with the state police power, which exists in its own right. Hence the question is not whether an emergency furnishes the occasion for the exercise of that state power, but whether an emergency furnishes an occasion for the relaxation of the restrictions upon the power imposed by the contract impairment clause; and the difficulty is that the contract impairment clause forbids state action under any circumstances, if it have the effect of impairing the obligation of contracts. That clause restricts every state power in the particular specified, no matter what may be the occasion. It does not contemplate that an emergency shall furnish an occasion for softening the restriction or making it any the less a restriction upon state action in that contingency than it is under strictly normal conditions.

The Minnesota statute either impairs the obligation of contracts or it does not. If it does not, the occasion to which it relates becomes immaterial, since then the passage of the statute is the exercise of a normal, unrestricted, state power and requires no special occasion to render it effective. If it does, the emergency no more furnishes a proper occasion for its exercise than if the emergency were non-existent. And so, while, in form, the suggested distinction seems to put us forward in a straight line, in reality it simply carries us back in a

circle, like bewildered travelers lost in a wood, to the point where we parted company with the view of the state court.

If what has now been said is sound, as I think it is, we come to what really is the vital question in the case: Does the Minnesota statute constitute an impairment of the obligation of the contract now under review?

In answering that question we must first of all distinguish the present legislation from those statutes which, although interfering in some degree with the terms of contracts, or having the effect of entirely destroying them, have nevertheless been sustained as not impairing the obligation of contracts in the constitutional sense. Among these statutes are such as affect the remedy *merely,* as to which this court said in *Bronson* v. *Kinzie, supra,* at p. 316, and repeated in *Edwards* v. *Kearzey, supra,* p. 604, " Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the Constitution."

Another class of statutes is illustrated by those exempting from execution and sale certain classes of property, like the tools of an artisan. Chief Justice Taney, in *Bronson* v. *Kinzie, supra,* speaking *obiter,* said that a state might properly exempt necessary implements of agriculture, or the tools of a mechanic, or articles of necessity in household furniture. But this court, in *Edwards* v. *Kearzey, supra,* struck down a provision of the North Carolina constitution which exempted every homestead, and the dwelling and buildings used therewith, not exceeding in value $1,000, on the ground of its unconstitutionality as applied to a contract already in existence. Referring to the opinion in *Bronson* v. *Kinzie,* the court said (p. 604)

that the Chief Justice seems to have had in his mind the maxim " *de minimis,*" etc. " Upon no other ground can any exemption be justified."

It is quite true also that " the reservation of essential attributes of sovereign power is also read into contracts "; and that the legislature cannot " bargain away the public health or the public morals." General statutes to put an end to lotteries, the sale or manufacture of intoxicating liquors, the maintenance of nuisances, to protect the public safety, etc., although they have the indirect effect of absolutely destroying private contracts previously made in contemplation of a continuance of the state of affairs then in existence but subsequently prohibited, have been uniformly upheld as not violating the contract impairment clause. The distinction between legislation of that character and the Minnesota statute, however, is readily observable. It may be demonstrated by an example. A, engaged in the business of manufacturing intoxicating liquor within a state, makes a contract, we will suppose, with B to manufacture and deliver at a stipulated price and at some date in the future, a quantity of whisky. Before the day arrives for the performance of the contract the state passes a law prohibiting the manufacture and sale of intoxicating liquor. The contract immediately falls because its performance has ceased to be lawful. This is so because the contract is made upon the implied condition that a particular state of things shall continue to exist, " and when that state of things ceases to exist the bargain itself ceases to exist." *Marshall* v. *Glanvill*, [1917] 2 K.B. 87, 91. In that case the plaintiff had been employed by the defendants upon a contract of service. While the contract was in force the country became involved in the World War, and plaintiff was called into the military service. The court held that this rendered performance unlawful and that the contract was at an end. It said:

"Here the parties clearly made their bargain on the footing that it should continue lawful for the plaintiff to render and for the defendants to accept his services. The rendering and acceptance of these services ceased to be lawful in July, 1916, and thereupon the bargain came to an end."

In *In re Shipton, Anderson & Co.,* [1915] 3 K.B. 676, a parcel of wheat then lying in a warehouse was sold for future payment and delivery. The wheat was subsequently requisitioned by the English government, and the sellers became unable to deliver. The Court of King's Bench Division held that the sellers were not liable. Darling, Justice, agreeing with the opinion of Lord Reading, said (pp. 683–684):

"If one contracts to do what is then illegal, the contract itself is altogether bad. If after the contract has been made it cannot be performed without what is illegal being done, there is no obligation to perform it. In the one case the making of the contract, in the other case the performance of it, is against public policy. It must be here presumed that the Crown acted legally, and there is no contention to the contrary. We are in a state of war; that is notorious. The subject-matter of this contract has been seized by the State acting for the general good. *Salus populi suprema lex* is a good maxim, and the enforcement of that essential law gives no right of action to whomsoever may be injured by it."

The general subject is discussed by this court in *Omnia Co. v. United States,* 261 U.S. 502; and it is there pointed out (p. 513) that the effect of such a requisition is not to appropriate the contract but to frustrate it—an essentially different thing.

The same distinction properly may be made as to the contract impairment clause, in respect of subsequent state legislation rendering unlawful a state of things which was lawful when an obligation relating thereto was contracted.

By such legislation the obligation is not impaired in the constitutional sense. The contract is frustrated—it disappears in virtue of an implied condition to that effect read into the contract itself. Thus, in *F. A. Tamplin Steamship Co.* v. *Anglo-Mexican Petroleum Products Co.*, [1916] 2 A.C. 397, the House of Lords had before it a case where a steamer, then subject to a charter party having nearly three years to run, had been requisitioned by the Admiralty. The applicable rule was there stated to be that the court should examine the contract and the circumstances in which it was made in order to see whether or not from their nature the parties must have made their bargain on the footing that a particular state of things would continue to exist. And if they must have done so, a term to that effect would be implied, though not expressed in the contract. In *Metropolitan Water Board* v. *Dick, Kerr & Co.*, [1918] A.C. 119, 127–128, 137, that rule was reaffirmed, with the additional statement that a subsequent law might be the cause of an impossibility of performance, by taking away something from the control of the party as to which thing he had contracted to do or not to do something else; and that the court must determine whether this contingency is of such a character that it can reasonably be implied to have been in the contemplation of the parties when the contract was made.

Bearing in mind these aids toward determining whether such an implied condition may be read into a particular contract, let us revert to the example already given with respect to an agreement for the manufacture and sale of intoxicating liquor. And let us suppose that the state, instead of passing legislation prohibiting the manufacture and sale of the commodity, in which event the doctrine of implied conditions would be pertinent, continues to recognize the general lawfulness of the business, but, because of what it conceives to be a justifying emergency, provides that the time for the performance of existing

contracts for future manufacture and sale shall be extended for a specified period of time. It is perfectly admissible, in view of the state power to prohibit the business, to read into the contract an implied proviso to the effect that the business of manufacturing and selling intoxicating liquors shall not, prior to the date when performance is due, become unlawful; but in the case last put, to read into the contract a pertinent provisional exception in the event of intermeddling state action would be more than unreasonable, it would be absurd, since we must assume that the contract was made on the footing that so long as the obligation remained lawful the impairment clause would effectively preclude a law altering or nullifying it however exigent the occasion might be.

That, in principle, is precisely the case here. The contract is to repay a loan within a fixed time, with the express condition that upon failure the property given as security shall be sold, and that, in the absence of a timely redemption, title shall be vested absolutely in the purchaser. This contract was lawful when made; and it has never been anything else. What the legislature has done is to pass a statute which does not have the effect of frustrating the contract by rendering its performance unlawful, but one which, at the election of one of the parties, postpones for a time the effective enforcement of the contractual obligation, notwithstanding the obligation, under the exact terms of the contract, remains lawful and possible of performance after the passage of the statute as it was before.

The rent cases—*Block* v. *Hirsh,* 256 U.S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U.S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U.S. 242—which are here relied upon, dealt with an exigent situation due to a period of scarcity of housing caused by the war. I do not stop to consider the distinctions between them and the present case or to do more than point out that the question of contract im-

pairment received little, if any, more than casual con-
sideration. The writer of the opinions in the first two
cases, speaking for this court in a later case, *Pennsyl-
vania Coal Co.* v. *Mahon,* 260 U.S. 393, 416, characterized
all of them as having gone " to the verge of the law."
It, therefore, seems pertinent to say that decisions which
confessedly escape the limbo of unconstitutionality by
the exceedingly narrow margin suggested by this char-
acterization should be applied toward the solution of a
doubtful question arising in a different field with a very
high degree of caution. Reasonably considered they do
not foreclose the question here involved; and it should
be determined upon its merits without regard to those
cases.

We come back, then, directly, to the question of im-
pairment. As to that, the conclusion reached by the
court here seems to be that the relief afforded by the
statute does not contravene the constitutional provision
because it is of a character appropriate to the emergency
and allowed upon what are said to be reasonable con-
ditions.

It is necessary, first of all, to describe the exact situa-
tion. Appellees obtained from appellant a loan of $3,800;
and to secure its payment, executed a mortgage upon real
property consisting of land and a fourteen-room house
and garage. The mortgage contained the conventional
Minnesota provision for foreclosure by advertisement.
The mortgagors agreed to pay the debt, together with in-
terest and the taxes and insurance on the property. They
defaulted; and, in strict accordance with the bargain, ap-
pellant foreclosed the mortgage by advertisement and
caused the premises to be sold. Appellant itself bought
the property at the sale for a sum equal to the amount of
the mortgage debt. The period of redemption from that
sale was due to expire on May 2, 1933; and, assuming no
redemption at the end of that day, under the law in force

when the contract was made and when the property was sold and in accordance with the terms of the mortgage, appellant would at once have become the owner in fee and entitled to the immediate possession of the property. The statute here under attack was passed on April 18, 1933. It first recited and declared that an economic emergency existed. As applied to the present case, it arbitrarily extended the period of redemption expiring on May 2, 1933, to May 18, 1933—a period of sixteen days; and provided that the mortgagor might apply for a further extension to the district court of the county. That court was authorized to extend the period to a date not later than May 1, 1935, on the condition that the mortgagor should pay to the creditor all or a reasonable part of the income or rental value, as to the court might appear just and equitable, toward the payment of taxes, insurance, interest and principal mortgage indebtedness, and at such times and in such manner as should be fixed by the court. The court to whom the application in this case was made extended the time until May 1, 1935, upon the condition that payment by the mortgagor of the rental value, forty dollars per month, should be made.

It will be observed that whether the statute operated directly upon the contract or indirectly by modifying the remedy, its effect was to extend the period of redemption absolutely for a period of sixteen days, and conditionally for a period of two years. That this brought about a substantial change in the terms of the contract reasonably cannot be denied. If the statute was meant to operate only upon the remedy, it, nevertheless, as applied, had the effect of destroying for two years the right of the creditor to enjoy the ownership of the property, and consequently the correlative power, for that period, to occupy, sell or otherwise dispose of it as might seem fit. This postponement, if it had been unconditional, undoubtedly would have constituted an unconstitutional

impairment of the obligation. This court so decided in *Bronson* v. *Kinzie, supra,* where the period of redemption was extended for a period of only twelve months after a sale under a decree; in *Howard* v. *Bugbee, supra,* where the extension was for two years; and in *Barnitz* v. *Beverly, supra,* where the period was extended for eighteen months. Those cases, we may assume, still embody the law, since they are not overruled.

The only substantial difference between those cases and the present one is that. here the extension of the period of redemption and postponement of the creditor's ownership, is accompanied by the condition that the rental value of the property shall, in the meantime, be paid. Assuming for the moment, that a statute extending the period of redemption may be upheld if something of commensurate value be given the creditor by way of compensation, a conclusion that payment of the rental value during the two years' period of postponement is even the approximate equivalent of immediate ownership and possession is purely gratuitous. How can such payment be regarded, in any sense, as compensation for the postponement of the contract right? The ownership of the property to which petitioner was entitled carried with it not only the right to occupy or sell it, but, ownership being retained, the right to the rental value as well. So that in the last analysis petitioner simply is allowed to retain a part of what is its own as compensation for surrendering the remainder. Moreover, it cannot be foreseen what will happen to the property during that long period of time. The buildings may deteriorate in quality; the value of the property may fall to a sum far below the purchase price; the financial needs of appellant may become so pressing as to render it urgently necessary that the property shall be sold for whatever it may bring.

However these or other supposable contingencies may be, the statute denies appellant for a period of two years

the ownership and possession of the property—an asset which, in any event, is of substantial character, and which possibly may turn out to be of great value. The statute, therefore, is not merely a modification of the remedy; it effects a material and injurious change in the obligation. The legally enforceable right of the creditor when the statute was passed was, at once upon default of redemption, to become the fee simple owner of the property. Extension of the time for redemption for two years, whatever compensation be given in its place, destroys that specific right and the correlative obligation, and does so none the less though it assume to create *in invitum* another and different right and obligation of equal value. Certainly, if A should contract with B to deliver a specified quantity of wheat on or before a given date, legislation, however much it might purport to act upon the remedy, which had the effect of permitting the contract to be discharged by the delivery of corn of equal value, would subvert the constitutional restriction.

A statute which materially delays enforcement of the mortgagee's contractual right of ownership and possession does not modify the remedy merely; it destroys, for the period of delay, *all* remedy so far as the enforcement of that right is concerned. The phrase, " obligation of a contract," in the constitutional sense imports a legal duty to perform the specified obligation of *that* contract, not to substitute and perform, against the will of one of the parties, a different, albeit equally valuable, obligation. And a state, under the contract impairment clause, has no more power to accomplish such a substitution than has one of the parties to the contract against the will of the other. It cannot do so either by acting directly upon the contract, or by bringing about the result under the guise of a statute in form acting only upon the remedy. If it could, the efficacy of the constitutional restriction would, in large measure, be made to disappear.

As this court has well said, whatever tends to postpone or retard the enforcement of a contract, to that extent weakens the obligation. According to one Latin proverb; "He who gives quickly, gives twice," and according to another, "He who pays too late, pays less." "Any authorization of the postponement of payment, or of means by which such postponement may be effected, is in conflict with the constitutional inhibition." *Louisiana* v. *New Orleans*, 102 U.S. 203, 207. I am not able to see any real distinction between a statute which in substantive terms alters the obligation of a debtor-creditor contract so as to extend the time of its performance for a period of two years, and a statute which, though in terms acting upon the remedy, is aimed at the obligation (as distinguished, for example, from the judicial procedure incident to the enforcement thereof) and which does in fact withhold from the creditor, for the same period of time, the stipulated fruits of his contract.

I quite agree with the opinion of the court that whether the legislation under review is wise or unwise is a matter with which we have nothing to do. Whether it is likely to work well or work ill presents a question entirely irrelevant to the issue. The only legitimate inquiry we can make is whether it is constitutional. If it is not, its virtues, if it have any, cannot save it; if it is, its faults cannot be invoked to accomplish its destruction. If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned. Being unable to reach any other conclusion than that the Minnesota statute infringes the constitutional restriction under review, I have no choice but to say so.

I am authorized to say that MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER concur in this opinion.